# UNITED STATES of America, Plaintiff–Appellee,

v.

Oscar DIAZ; Jose Manuel Ruiz; Jesus Manuel Fernandez; Al Pastor; Billy Allen, a/k/a William Holster Allen; Dudson Woods; Daniel Lee Deatherage; Kelly Fred Kalinowski; Irving Schwartz; Ramon Rodriguez, Jr.; Robert Lincoln Fowler; Joseph Thomas Marino and Samuel J. Degiso, Defendants–Appellants.

No. 90–7890.

United States Court of Appeals, Eleventh Circuit.

July 29, 1994.

**1536**

J.B. Sessions, U.S. Atty., Gloria Bedwell, Mobile, AL, for U.S.

Bill Clay, N. Bay Village, FL, Lawrence E. Besser, Miami, FL, for Diaz.

John Thorton, Jr., Thorton, Rothman & Emas, Miami, FL, Joel Hirschhorn, Coral Gables, FL, for Ruiz.

Domingo Soto, Mobile, AL, for Fernandez.

Richard R. Williams, Mobile, AL, for Pastor.

Leonard Rosenberg, Miami, FL, for Allen.

Gregory S. Reese, Mobile, AL, for Woods.

John Furman, Mobile, AL, for Kalinowski.

Joaquin Perez, Miami, FL, for Rodriguez.

John R. Howes, Ft. Lauderdale, FL, for Marino.

James W. May, Foley, AL, for Degiso.

Robert Levitt, Atlanta, GA, for Swartz.

Alan E. Weinstein, Miami Beach, FL, for Deatherage.

David Garber and Jana V. Jay, Naples, FL, for Fowler.

Before EDMONDSON, Circuit Judge, JOHNSON, Senior Circuit Judge, and PITTMAN *, Senior District Judge.

JOHNSON, Senior Circuit Judge:

Defendant-appellant Oscar Diaz and twelve co-defendants ("Appellants")[1] appeal various aspects of their convictions and sentences arising out of their participation in a cocaine importation and distribution conspiracy. After due consideration, we affirm Appellants' convictions and sentences.

## I. STATEMENT OF THE CASE

### A. *Background Facts*

#### 1. The drug deal

On March 7, 1990, informant Ellis McKenzie informed Customs Agent Lawrence Winberg that appellant Billy Allen and others were involved with narcotics. McKenzie gave Agent Winberg Allen's telephone number. Winberg then contacted Allen, identifying himself as a Colombian drug dealer. As a result of these conversations and ensuing negotiations, Winberg and other undercover agents went to Miami, Florida to meet with Allen and some of his fellow conspirators.

On March 25, 1990, Agent Winberg, Agent James Tanner, and McKenzie met with Allen and appellant Dudson Woods at the Sofitel Hotel to discuss their cocaine deal. Agent Tanner testified that he overheard a conversation between Allen and McKenzie in which Allen mentioned a previous cocaine trip to

---

* Honorable Virgil Pittman, Senior U.S. District Judge for the Southern District of Alabama, sitting by designation.

1. The other appellants are Jose Manuel Ruiz, Jesus Manuel Fernandez, Al Pastor, Billy Allen, Dudson Woods, Daniel Lee Deatherage, Kelly Fred Kalinowski, Irving Schwartz, Ramon Rodriguez, Jr., Robert Lincoln Fowler, Joseph Thomas Marino, and Samuel J. Degiso.

Honduras and stated how rich they would become at the conclusion of the drug transaction. The next day Allen introduced Agent Tanner and Agent Kyle Barnette to appellant Joseph Marino. Later that day, Winberg, Barnette, and Tanner met with Fabio DeChristofaro and appellants Samuel Degiso, Irving Schwartz, Allen, Woods, and Marino. At this meeting, videotaped by the government, Schwartz told Winberg that he could transport the cocaine using a specially prepared airplane. Agent Winberg stated that he would supply his own transportation, whereupon Schwartz offered to buy 1,000 kilograms of cocaine for $10,000—$12,000 per kilogram. They agreed that Schwartz would pay $250,000 "earnest money" in the United States.

At a videotaped meeting on March 27, 1990, attended by Winberg, Tanner, Barnette, McKenzie, Schwartz, Marino, Andy Schell, and Larry Feder, Schwartz stated that he wanted a long-term deal. Following the meeting, surveillance units photographed Marino, Schwartz, Feder, and Schell talking in the parking lot. These units later photographed Marino meeting with appellant Dan Deatherage. Winberg subsequently informed Allen and Woods about the meeting and told them that he would go to Honduras to work out the deal in early April.

In early April of 1990, Agents Winberg and Barnette met Schwartz at a Hilton Hotel in Pensacola, Florida to discuss the logistics of the cocaine deal. Schwartz told them that: (1) the cocaine would be sold in the Northeast; (2) he had a good organization; and (3) his people were "prepared to die." Subsequently, it was arranged for Agent Winberg to meet with Schwartz and Marino in Mobile, Alabama to receive the $250,000 earnest money. The parties agreed that Schwartz or Marino would remain with Winberg until payment of the balance on the cocaine.

On April 10, 1990, the Customs Service in New Orleans, Louisiana detained McKenzie as he tried to enter the United States from Honduras. Customs agents stopped McKenzie because he had crack cocaine on his person. Winberg went to New Orleans and met with McKenzie, who was released.

On April 14, 1990, Marino called Winberg to tell him he was at a hotel in Baldwin County, Alabama. Two days later, Winberg and Barnette met with Schwartz at the hotel to receive the earnest money. Feder, Marino, and Deatherage were also present.

On April 17, Agents Winberg, Barnette, and Mike Ciaurro met Schwartz to discuss delivering the cocaine in Baldwin County, Alabama. Because Schwartz told the agents that he wanted to see the cocaine, Winberg and Ciaurro accompanied Deatherage to view the cocaine.[2] When shown the cocaine, Deatherage snorted some. The delivery was then set for the next day.

In the morning of April 18, 1990, Marino met with Agents Winberg, Barnette and Ciaurro, telling them that Schwartz and Deatherage had gone to meet the drivers. Barnette then left to prepare the delivery site. Marino also told the agents that (1) he, Schwartz, Schell, and Feder put up the money for the cocaine and (2) that Mannie (appellant Jose Manuel Ruiz) was in charge of transportation. Marino then offered to stay in Alabama until the balance of the money was paid.

As arranged, Schwartz, Deatherage, and Agents Barnette and Tanner rendezvoused with the drivers. At the rendezvous site, Schwartz told the agents that he would be using two trucks and a Nissan automobile to transport the drugs—each truck would hold 250 kilograms with the Nissan carrying sixty kilograms in a secret compartment. Schwartz introduced appellants Deatherage and Kelly Kalinowski as "his guys." He then instructed everybody to go to the loading site, a barn in Baldwin County, while he returned to the hotel. At the loading site, Agent Keith Barnette observed appellants Oscar Diaz and Jesus Fernandez working as part of Schwartz's loading and transportation crew. Diaz told Keith Barnette that the cocaine would be hidden in the truck's sleeper compartment. As the cocaine was being

---

**2.** The cocaine was not actually from Honduras but was instead from the government's supply of previously confiscated cocaine.

loaded, several agents[3] observed Deatherage and Ruiz counting the bags. Agent Tanner overheard Ruiz telling Deatherage to verify the count because any shortfall would come out of their pockets. Assisting in the unloading were appellants Degiso, Kalinowski, Fernandez, Ramon Rodriguez, and Al Pastor. Agents observed Diaz loading the sleeper compartment and overheard a conversation between him and Rodriguez in which each thought that the other had been counting. Ruiz was then heard telling them that they were partners and had better get it straight. Diaz then began using a calculator.

Meanwhile, appellant Robert Fowler asked one of the agents if he could cover the floor because he was going to open the Nissan's secret compartment beneath the vehicle and did not want to get dirty. As Fowler got under the Nissan, he told agents that it would hold sixty kilograms. Fowler also told agents that he did not know how to open the compartment because he had never before used it. Fowler asked for various tools, but Fernandez told him that none were available.

Once the cocaine was loaded, the men were arrested. Schwartz and Marino were arrested at their hotel. Woods and Allen were arrested in Miami on April 22, 1990. In a post-arrest statement, Woods admitted working for Feder and telling Feder that he could obtain cocaine from McKenzie.

### 2. Schell's testimony

Andy Schell testified for the government. He identified "Mannie" as appellant Manuel Ruiz and admitted being involved in the drug business with Schwartz, Marino, and Ruiz. Schell testified that after meeting Schwartz and Marino, he began buying cocaine from Schwartz, Marino, and Deatherage and that Feder later became involved. Schell also testified that, at Schwartz's request, he raised $70,000 for the deal with Agent Winberg. Schell identified Deatherage, Woods, and Allen as Schwartz's partners.

### B. *Procedural History*

On April 19, 1990, Marino, Schwartz, Deatherage, Degiso, Ruiz, Diaz, Rodriguez, Pastor, Kalinowski, Fowler, and Fernandez were indicted in a five-count indictment charging them with (I) conspiracy to possess with intent to distribute cocaine, (II) attempt to import cocaine, (III) conspiracy to import cocaine, (IV) attempt to possess cocaine with intent to distribute, and (V) possession of cocaine with intent to distribute. A separate but identical indictment was issued against Allen and Woods. The two cases were then consolidated.

The trial began September 19, 1990 and lasted approximately two and one-half weeks. During the trial, the court granted judgment of acquittal motions in favor of Diaz, Fernandez, Pastor, Kalinowski, Rodriguez, and Fowler on Counts II and III. Following the giving of an *Allen* charge, Marino, Schwartz, Degiso, Allen, Deatherage, Woods, and Ruiz were convicted of Counts I, III, and V and found not guilty on Counts II and IV. In addition, Diaz, Fernandez, Pastor, Kalinowski, Rodriguez, and Fowler were convicted on Count V and acquitted on Counts I and IV. Appellants were sentenced to lengthy prison terms.

## II. ANALYSIS

Among them, Appellants raise multiple issues concerning alleged errors at trial and sentencing.[4] We address below only those issues having merit, specifically whether: (1) the district court abused its discretion in restricting cross-examination of Agent Keith Barnette or informant McKenzie; (2) the prosecutor impermissibly injected race into the trial; (3) the prosecutor struck a venireperson based on race; (4) the court erred in admitting post-arrest statements of Fowler; and (5) Appellants' sentences violate either the Ex Post Facto Clause or the Eighth Amendment.[5]

3. A number of agents were in the barn, pretending to be part of Winberg's Colombian drug gang.

4. We note that not all Appellants join in each claim. Nonetheless for the sake of convenience,

we will refer to Appellants when discussing each claim.

5. Having carefully studied the record, we find that *all* other issues raised by Appellants are without merit. Accordingly, further discussion is

### A. Limitations on Cross–Examination

#### 1. Agent Barnette

█ Shortly after Appellants were arrested, Agent Keith Barnette was arrested and charged by Alabama authorities with vehicular homicide committed while on duty.[6] At trial, Appellants sought to question Barnette regarding the arrest and discrepancies between his testimony and his rough notes, prepared one week after the arrest. Appellants proffered that they would impeach Barnette by showing that he had changed his testimony as a result of the arrest in the hopes of receiving leniency in his pending criminal case and/or assistance in any civil actions against him. However, the government filed a motion in limine to prevent defense counsel from examining Barnette concerning the vehicular homicide action. In granting the government's motion, the district court held that so long as Barnette's testimony was consistent with his rough notes, which had previously been turned over to Appellants, Appellants could not question Barnette about the accident or pending action against him.

On direct examination, Barnette testified that Diaz had spoken to him regarding the "count" on the cocaine and had used a calculator to add the cocaine packages. On cross-examination, Barnette admitted that his notes did not reflect the conversation or Diaz's use of a calculator. Appellants then asked Barnette whether there had "been new developments in your life that might cause you to want to curry favor with the United States Government prosecutors and customs agents and other law enforcement agents in this case." Barnette answered in the negative. Asked the same question a second time by the court, Barnette again denied having any reason to "curry favor." Appellants then moved to pursue further this line of questioning, which was denied.

Appellants next asked whether Barnette was under investigation by the Internal Affairs of the Customs Service and no longer on active duty. The court sustained the government's objections before Barnette answered either question. However, Barnette did answer "yes" in response to Appellants' question if he would lose his job if he committed perjury. On redirect, Barnette testified that the day after Appellants' arrest and prior to creating his notes, he told the U.S. Attorney's Office about the conversation with Diaz and about Diaz's use of a calculator. After the government concluded its case-in-chief, defense counsel recalled the witness and attempted to establish its proffer. As before, Barnette denied being biased or motivated on behalf of the government. Consequently, the court maintained its prior ruling prohibiting examination into the vehicular homicide action. On appeal, Appellants claim that restricting Barnette's cross-examination was error. We disagree.

█ Although the district court possesses discretionary power to rule on the admissibility of evidence, *United States v. Garcia*, 13 F.3d 1464, 1468 (11th Cir.), *cert. denied*, —— U.S. ——, 114 S.Ct. 2723, 129 L.Ed.2d 847 (1994), its discretion in limiting the scope of cross-examination is subject to the requirements of the Sixth Amendment. *Id.*; *United States v. Lankford*, 955 F.2d 1545, 1548 (11th Cir.1992).[7] The right to cross-examine is not unlimited, however, because once there is sufficient cross-examination to satisfy the Confrontation Clause, further questioning is within the district court's discretion. *United States v. Taylor*, 17 F.3d 333, 340–41 (11th Cir.1994). "The test for the Confrontation Clause is whether a reasonable jury would have received a signifi-

---

not warranted with regard to Appellants' claims concerning (1) various acts of alleged prosecutorial misconduct, (2) suppression motions, (3) the completeness of the trial transcript, (4) double jeopardy, (5) peremptory challenges, (6) the admission of Deatherage's other crimes and certain statements made by Marino, (7) the *Allen* charge, (8) violations of the Jencks Act, (9) the sufficiency of the evidence, and (10) Winberg's cross-examination.

**6.** At the time that Barnette testified, he performed only administrative duties pending the results of an internal affairs investigation. A civil action was also instituted against him.

**7.** The Confrontation Clause of the Sixth Amendment provides: "In all criminal prosecutions, the accused shall enjoy the right ... to be confronted with the witnesses against him." U.S. Const., sixth amend.

cantly different impression of the witness' credibility had counsel pursued the proposed line of cross-examination." *Id.* (quoting *Garcia*, 13 F.3d at 1469).

■ Appellants wished to question Barnette about the state court indictment, hypothesizing that it gave him motive to testify favorably for the government in the hopes that he would receive leniency or assistance as to the homicide action. Appellants rely on *Greene v. Wainwright*, 634 F.2d 272, 275–76 (5th Cir.1981) for the proposition that because they were attempting to show bias on the part of a prosecution witness, Barnette, the limitation on cross-examination was unconstitutional. Nonetheless, the mere fact that Appellants sought to explore bias on the part of a prosecution witness does not automatically void the court's ability to limit cross-examination. It is axiomatic that the right to cross-examination is not absolute because "the information sought to be elicited must be relevant." *Haber v. Wainwright*, 756 F.2d 1520, 1522 (11th Cir.1985).

Here, Barnette's testimony was consistent with statements given prior to both the creation of his notes and his arrest. Barnette's testimony simply parroted statements made at a time when he had no special incentive to seek the government's help. Because of the highly prejudicial nature of the arrest, the court properly handled the cross-examination by limiting inquiry into the accident as long as Barnette's testimony did not deviate from his notes and prior statements. The fact that his testimony was entirely consistent with these prior statements demonstrates that Barnette was not shading his testimony in an effort to gain leniency on his state court case. Moreover, we note that there is no evidence in the record showing that the government had the ability to grant leniency in Barnette's Alabama action.[8] In light of these circumstances, we fail to see how the limitation on cross-examination constituted an abuse of discretion or violated the Sixth Amendment. *See United States v. Thorn*, 917 F.2d 170, 176 (5th Cir.1990) (barring

defendant from exploring government witness' state law indictment did not violate Sixth Amendment as there was no evidence the government could influence the state court proceedings, and the existence of a pending state court indictment on charges totally unrelated to the testimony offered in the case did not give the witness a substantial reason to cooperate with the government). Finally, Appellants were able to delve into Barnette's credibility, albeit in a limited fashion, by inquiring if he had any reason to "curry favor" with the government. Thus, the district court did not abuse its discretion by limiting Appellants' cross-examination of Barnette.

### 2. Informant Ellis McKenzie

At trial, the government declined to call McKenzie as a witness. Instead, Appellants introduced McKenzie's testimony via a pretrial deposition. Appellants planned to use the deposition to show that Winberg lied in stating that he had not intervened and assisted McKenzie when McKenzie was detained for possession of crack cocaine in New Orleans. Additionally, Appellants sought to demonstrate that McKenzie might be biased in favor of the government to prevent criminal charges being brought concerning the New Orleans crack incident. The district court refused to allow Appellants to introduce the entire deposition, allowing only those portions that it deemed relevant for impeachment purposes. Thus, Appellants were prohibited from introducing McKenzie's testimony about his detention in New Orleans. However, the court did permit Appellants to introduce portions of the transcript in which McKenzie admitted being a paid government informant. Appellants claim that the court's limitation violated their Sixth Amendment confrontation rights and constituted reversible error. We disagree.

■ The court did not err by refusing to allow Appellants to enter either those portions of McKenzie's deposition involving the

---

**8.** Appellants' reliance on *Lankford* is misplaced inasmuch as *Lankford* involved a witness' possible motive to cooperate with the government in order to (1) "protect his sons," (2) "obtain federal assistance in avoiding a subsequent federal prosecution against them," and (3) "solicit help [from the] federal government in his sons' state case." 955 F.2d at 1549. The facts in this case are substantially different.

New Orleans incident or the deposition *in toto*. *See United States v. Thompson,* 976 F.2d 666, 671 (11th Cir.1992) (introduction of complete medical records unwarranted where they were not as a whole probative of witness' credibility; only those portions inconsistent with witness' trial testimony were probative and could be used for impeachment), *cert. denied,* —— U.S. ——, 113 S.Ct. 3010, 125 L.Ed.2d 701 (1993). Furthermore, a review of the record demonstrates no significant inconsistencies between Winberg's and McKenzie's descriptions of the New Orleans crack incident. Accordingly, the district court did not err in limiting the impeachment uses of McKenzie's deposition.

■■■ We find that Appellants' Sixth Amendment claims similarly lack substance. Although Appellants wanted to probe deeply into McKenzie's background, the Sixth Amendment is satisfied where sufficient information is elicited to allow the jury to gauge adequately a witness' credibility and to assess his motives or possible bias. *United States v. Burke,* 738 F.2d 1225, 1227–28 (11th Cir.1984) (sufficient information elicited where jury knows a witness has been granted immunity, participated in the witness protection program, and received money from the government). For example, in *United States v. Kopituk,* we held that a court does not abuse its discretion by limiting cross-examination of the government's "most vital" witness where the jury knows that the witness has an agreement with the government to testify in exchange for a lenient plea arrangement on pending charges. 690 F.2d 1289, 1337 (11th Cir.1982), *cert. denied,* 461 U.S. 928, 103 S.Ct. 2089, 2090, 77 L.Ed.2d 300 (1983).

Here, analogous information was presented to the jury. McKenzie, who can in no way be termed a "vital witness," admitted that he was a government informant, that he had been paid money in the past, and that he had received $12,000 in this case. He also testified that he had received $2,000 the day before his deposition and that he spent time preparing for his deposition in the company of Agents Kyle Barnette and Dwight McDaniel. The jury also knew that McKenzie stood to receive $250,000, representing the maximum award allowed to informants. Finally, the jury was aware that whether McKenzie actually received the $250,000 would be determined by Winberg's superiors. Under these circumstances, no further bias would have been exposed by investigation into McKenzie's character or the events surrounding his New Orleans detention. *United States v. Alonso,* 740 F.2d 862, 874 (11th Cir.1984) (court properly prohibited inquiry into facts concerning witness' arrest; defendants were allowed to ask if witness made a deal with government or expected a benefit for testifying), *cert. denied,* 469 U.S. 1166, 105 S.Ct. 928, 83 L.Ed.2d 939 (1985).[9]

### B. Racial Comments

■■■ Appellants claim that the prosecutor impermissibly injected race into the case during the redirect of Schell wherein the following exchange occurred:

PROSECUTOR: You responded to some questions related to pressure from Mr. Schwartz and Mr. Marino about money that was owed, do you recall those questions?

SCHELL: Yes.

PROSECUTOR: What type of pressure, if any, was applied to you for collection for money?

SCHELL: Mr. Marino, not Mr. Schwartz. He had told me that I couldn't control Struder and that the only way to control him was to take a bat to him. He used other words but that was the jist [sic] of it.

DEFENSE COUNSEL: I object to the conclusion of remarks as to what he considers the jist [sic] of something said to him and ask that last statement be stricken.

---

9. Given the overwhelming evidence presented against each appellant, even if we were to conclude that McKenzie's cross-examination had erroneously been limited, the error would have been harmless. *See Grizzell v. Wainwright,* 692 F.2d 722, 726 (11th Cir.1982) (no "reasonable probability" that verdict was affected by the error), *cert. denied,* 461 U.S. 948, 103 S.Ct. 2129, 77 L.Ed.2d 1307 (1983).

THE COURT: I am not sure I understand your last answer, without giving any undue. . . .

SCHELL: Okay. Struder—he told me that he wanted to go to Struder's house and that *the only way to control a nigger was to beat him with a bat.*

THE COURT: Overrule your objection.

PROSECUTOR: Were those Mr. Marino's exact words?

SCHELL: Yes.

PROSECUTOR: *Is Mr. Struder a black man?*

DEFENSE COUNSEL: Judge, I object. That is absolutely immaterial and irrelevant in regard to this.

THE COURT: Overruled.

(emphasis supplied).

Schell did not answer the prosecutor's question as the prosecutor immediately moved onto other points. At a bench conference following this examination, Appellants moved for a mistrial, alleging that the government was attempting to inflame the black jurors against the white Appellants. The district court denied the motion. Appellants declined the court's offer to give a curative instruction.

While this Court is ever-vigilant regarding the improper injection of race into criminal trials, the prosecutor's statements do not constitute an improper appeal to race. Thus, we do not believe that a mistrial was warranted. *See Willis v. Kemp*, 838 F.2d 1510, 1522–23 (11th Cir.1988) (although improper, prosecutor's question of black defendant as to whether he referred to his white victim as a "honkey" was not grounds for granting a mistrial), *cert. denied*, 489 U.S. 1059, 109 S.Ct. 1328, 103 L.Ed.2d 596 (1989); *United States v. Krohn*, 573 F.2d 1382, 1389 (10th Cir.) (government's eliciting from a witness that one of two white defendants on trial for mail fraud had referred to a victim of their scheme as a "poor black bastard" was not an appeal to racial prejudice), *cert. denied*, 436 U.S. 949, 98 S.Ct. 2857, 56 L.Ed.2d 792 (1978). *See also United States v. Hernandez*, 865 F.2d 925, 927–28 (7th Cir.1989) (prosecutor's improper closing remark to "send clear message to Cuban drug dealers" was not so inflammatory as to prejudice Cuban defendant).

## C. Strike of Venireperson

At trial, the prosecutor exercised peremptory strikes to remove three black persons from the jury. Appellants assert that one of these challenges, that of venireperson Portis, violated the Constitution's equal protection guarantee because it was racially motivated. *See Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986). Without finding that Appellants had established a prima facie case of discrimination, the district court asked the prosecutor to articulate the reasons underpinning the strikes. The prosecutor responded that she struck Portis because (1) she believed that Portis may have been related to a defendant whom she had formerly prosecuted and (2) Portis was generally inattentive during the voir dire, focusing on the defense table during jury selection. The court upheld the strike of Portis.

We give great deference to a district court's finding that the government rebutted a prima facie case of discriminatory jury selection and reverse only if that finding is clearly erroneous. *United States v. Cure*, 996 F.2d 1136, 1138 (11th Cir.1993), *cert. denied*, —— U.S. ——, 114 S.Ct. 1075, 127 L.Ed.2d 393 (1994). Given that the court asked the prosecutor to explain her strikes of the black venirepersons, we shall assume that Appellants met the requirements of a prima facie case and therefore proceed directly to determining whether the prosecutor's reasons for striking Portis were race-neutral. The prosecutor's belief that the venireperson may have been related to a defendant in an earlier case did not justify the challenge. The record suggests that the venireperson was unrelated to that defendant as Portis did not affirmatively respond to the court's inquiry to the venire whether any family member had ever been involved in a criminal matter in court. Nonetheless, a venireperson's inability to pay attention is a proper race-neutral reason for using a peremptory strike. *See United States v. Hendrieth*, 922 F.2d 748, 749–50 (11th Cir.1991) (per curiam) (upholding trial court's decision to allow a strike based upon a juror's inatten-

tiveness and her rolling and rubbing her eyes during voir dire).

Explanations based upon a juror's demeanor are, however, difficult to confirm on appeal because the transcripts that comprise the record before the Court do not portray the unacceptable behavior. Moreover, such explanations are particularly susceptible to the kind of abuse prohibited by *Batson*. Consequently, to allow meaningful appellate review, trial judges should fully develop the record regarding the specific behavior by a venireperson that leads to a peremptory strike and should verify that the stricken venireperson's conduct was conspicuously different from that of the other venirepersons. *See United States v. Cooper*, 19 F.3d 1154, 1161 (7th Cir.1994) (upholding demeanor-based strikes in part because trial judge noted on record that, based on his own observations, the prosecutor's interpretations were reasonable); Michael J. Raphael & Edward J. Ungvarsky, *Excuses, Excuses: Neutral Explanations Under Batson v. Kentucky*, 27 U.MICH.J.L.REF. 229, 246–50, 266–67 (1993) (arguing that courts should reject demeanor-based explanations that cannot be confirmed by the record).

In this case, Appellants do not dispute that Portis directed her attention toward the defendants, away from the prosecution, during jury selection, allowing us to infer that Portis' behavior was different from the other venirepersons. *Cf. Cure*, 996 F.2d at 1138–39 (defense counsel's failure to offer contrary description of venireperson's demeanor militates against reversal). Accordingly, the district court did not clearly err by finding that the prosecutor offered a race-neutral reason for striking Portis from the jury.

### D. Robert Fowler's Post–Arrest Statement

Following the receipt of his *Miranda* rights at the barn, Fowler was asked if he wanted to waive his rights. He responded by shaking his head. He was then taken to jail. Some four hours after his arrival, agents brought him to an interview room where Agent McDaniel told Fowler the charges against him and that he would be tried in Alabama. Agent McDaniel then asked other agents present in the interview room if Fowler had been "Mirandized." The agents responded that he had been. Thinking that Fowler might not understand the term "Mirandized," McDaniel notified Fowler that he had a right to an attorney and a right not to speak to the agents. Fowler acknowledged that he was aware of his *Miranda* rights. McDaniel then asked him if he wished to cooperate. At trial, McDaniel testified that Fowler responded by saying that he could not cooperate, he did not know anything or anybody, he was paid to be "blank," and he was simply a chauffeur driving someone from Miami. McDaniel further testified that when he questioned Fowler about $500 that Fowler possessed when arrested, Fowler stated that he would rather not say who paid him and that he was sorry he had gotten greedy. Fowler then asked for an attorney and questioning ceased. The court denied Fowler's motion to suppress these statements.

On appeal, Fowler contends that the denial of his suppression motion was error because he had unequivocally invoked his *Miranda* rights. Assuming, without deciding, that Fowler is correct, the taking of his statements in contravention of *Miranda* is subject to the harmless error analysis. *United States v. Beale*, 921 F.2d 1412, 1435 (11th Cir.), *cert. denied*, —— U.S. ——, 112 S.Ct. 100, 116 L.Ed.2d 71 (1991); *United States v. Pena*, 897 F.2d 1075, 1082 (11th Cir.1990). Our inquiry is two-fold. First, we examine the effect the erroneously admitted statement had upon other evidence introduced at trial and upon the conduct of the defense. *Beale*, 921 F.2d at 1435. Second, if, absent the illegal statement, the remaining evidence is so overwhelming to establish guilt beyond a reasonable doubt, admission of the statement is harmless. *Id.*

At trial, Agent Tanner testified that Schwartz told him that a Nissan automobile with a secret compartment in its underbelly capable of storing sixty kilograms of cocaine would be one of the vehicles used to load and transport the drugs. The government introduced photographs showing the Nissan's se-

cret compartment at trial. It is uncontroverted that Fowler was present at the barn and that he spent much time there under the Nissan. Agents Lamplaugh, Tanner, and Keith Barnette testified that at the barn Fowler expressly told them that he was attempting to open the Nissan's hidden compartment. Agents Lamplaugh and Tanner also testified that they overheard Fowler telling other appellants that he needed tools and a flashlight to open the compartment. Additionally, Agent Lamplaugh testified that Fowler told him that the compartment held sixty kilograms of cocaine. Given the overwhelming strength of this evidence, we conclude that the admission of Fowler's post-arrest statements was harmless error.

### E. Sentencing Issues

#### 1. Ex Post Facto Violation

■ To avoid ex post facto problems, we have held that a defendant is to be sentenced under the Guidelines and commentary in effect on the date of sentencing unless a more lenient punishment would occur under the Guidelines' version in effect on the date the offense was committed. *United States v. Wilson,* 993 F.2d 214, 216 (11th Cir.1993). Furthermore, Guideline commentary is authoritative unless its interpretation violates the law or is an erroneous reading of the Guidelines. *Stinson v. United States,* — U.S. —, —, 113 S.Ct. 1913, 1915, 123 L.Ed.2d 598 (1993).

■ Ruiz claims that an ex post facto violation occurred when the district court refused to give him an acceptance of responsibility reduction based on commentary that took effect *after* he was convicted but *before* he was sentenced. Although "application of an intervening Guideline interpretation by commentary promulgated after the offense could run afoul of the Ex Post Facto Clause," *United States v. Carroll,* 6 F.3d 735, 746 n. 9 (11th Cir.1993), *cert. denied,* — U.S. —, 114 S.Ct. 1234, 127 L.Ed.2d 577 (1994), we are not confronted with such a situation. Where, as here, the amendments do not overrule prior construction but instead serve to confirm our reading of the Guideline section, ex post facto concerns are not implicated. *Id.*

■ Prior to Ruiz's sentencing, the Guidelines stated:

> Conviction by trial does not preclude a defendant from consideration [for receiving an acceptance of responsibility reduction.] A defendant may manifest sincere contrition even if he exercises his constitutional right to a trial. This may occur, for example, where a defendant goes to trial to assert and preserve issues that do not relate to factual guilt (*e.g.,* to make a constitutional challenge to a statute or a challenge to the applicability of a statute to his conduct).

U.S.S.G. § 3E1.1 comment. (n. 2) (Nov. 1989). The revised commentary that the court applied at sentencing provides that the acceptance of responsibility reduction

> is not intended to apply to a defendant who puts the government to the burden of proof at trial by denying the essential factual elements of guilt, is convicted, and only then admits guilt and expresses remorse. Conviction by trial, however, does not automatically preclude a defendant from consideration for such a reduction. In rare situations a defendant may clearly demonstrate an acceptance of responsibility for his criminal conduct even though he exercises his constitutional right to a trial. This may occur, for example, where a defendant goes to trial to assert and preserve issues that do not relate to factual guilt (*e.g.,* to make a constitutional challenge to a statute or a challenge to the applicability of a statute to his conduct). In each such instance, however, a determination that a defendant has accepted responsibility will be based primarily upon pre-trial statements and conduct.

U.S.S.G. § 3E1.1 comment. (n. 2) (Nov. 1990). The district court's application of the sentencing Guidelines is subject to *de novo* review. *United States v. Rodriguez,* 959 F.2d 193, 195 (11th Cir.), *cert. denied,* — U.S. —, 113 S.Ct. 649, 121 L.Ed.2d 563 (1992).

■ We have previously held that entry of a not guilty plea and insistence upon a trial are factors that may be considered in

determining whether a defendant has accepted responsibility for his crime. *United States v. Castillo–Valencia*, 917 F.2d 494, 501 (11th Cir.1990) (holding that decision to go to trial may not be used to bar categorically an acceptance of responsibility reduction), *cert. denied*, 499 U.S. 925, 111 S.Ct. 1321, 113 L.Ed.2d 253 (1991). Moreover, we have also recognized that a defendant who exercises his right to trial may diminish his chance of being granted the acceptance of responsibility reduction as there is less evidence of acceptance to weigh in his favor. *Rodriguez*, 959 F.2d at 197. Thus, the revised commentary relied on by the district court does not overrule § 3E1.1 but instead accords with our reading of the section. In such cases, the Ex Post Facto Clause is not implicated. Thus, this claim fails. *Cf. Carroll*, 6 F.3d at 746 n. 9 (no ex post facto concerns where Guideline amendment regarding definition of a drug does not overrule prior constructions of the Guideline but instead confirms our reading of the Guideline).

### 2. Eighth Amendment

■ Schwartz claims that his life sentence violates the Eighth Amendment. According to Schwartz, the district court erred by mechanically applying the Guidelines and failing to appreciate that Schwartz did not possess the intent or the ability to purchase the cocaine, and that he could not have distributed it in any event as it was government owned and controlled. Schwartz thus asserts that his sentence is so unjust and harsh as to violate the Eighth Amendment. We reject Schwartz's claim. A review of the record indicates that the court sentenced each Appellant individually. Moreover, even assuming that the court failed to make individualized findings, the sentence may nonetheless be upheld where, as here, the record supports the amount of drugs attributed to the defendant. *United States v. Ismond*, 993 F.2d 1498, 1499 (11th Cir.1993). Because the amount of drugs attributed to Schwartz was proper, his life sentence is neither cruel nor unusual. *See United States v. Willis*, 956 F.2d 248, 251 (11th Cir.1992) (Guidelines do not violate Eighth Amendment).

### III. CONCLUSION

Appellants' sentences and convictions are AFFIRMED.