

1994 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

10-28-1994

# USA v. Bertoli

Precedential or Non-Precedential:

Docket 94-5167

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1994

Recommended Citation
"USA v. Bertoli" (1994). *1994 Decisions*. Paper 172.
http://digitalcommons.law.villanova.edu/thirdcircuit_1994/172

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 1994 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 94-5167
_____

UNITED STATES OF AMERICA

v.

RICHARD O. BERTOLI,

Appellant

_____

On Appeal from the United States District Court
for the District of New Jersey
(D.C. Criminal No. 89-00218-3)
_____

Argued September 20, 1994

BEFORE:  GREENBERG, ROTH, and ROSENN, Circuit Judges

(Filed: October 28, 1994)
_____

Richard W. Levitt
148 East 78th Street
New York, NY  10021

James D. Crawford (argued)
Schnader, Harrison, Segal &
Lewis
1600 Market Street
Suite 3600
Philadelphia, PA  19103

Attorneys for Appellant

Edna B. Axelrod
Glenn J. Moramarco (argued)
Office of United States Attorney
970 Broad Street
Room 502
Newark, NJ  07102

Attorneys for Appellee

GREENBERG, Circuit Judge.

This is an appeal from a final judgment of conviction and sentence entered by the United States District Court for the District of New Jersey on March 30, 1994. Richard O. Bertoli, the appellant, was convicted of obstruction of justice and conspiracy to obstruct justice, the third and sixth counts of a six-count indictment. On March 28, 1994, the district court sentenced Bertoli to a total term of 100 months imprisonment to be followed by two concurrent three-year terms of supervised release. In addition, the court imposed a $7 million fine.

Bertoli appeals from both his sentence and his conviction. He contends that he is entitled to a new trial because: (1) the district court failed to inquire properly into whether premature jury deliberations prejudiced him; (2) the district court's method of conducting ex parte in camera interviews with certain jurors violated his constitutional and procedural rights; and (3) the district court improperly supplied the jury with written transcripts of certain testimony. Bertoli argues in the alternative that his sentence should be vacated because: (1) the district court applied the wrong version of the Sentencing Guidelines Manual, thereby violating his right to be free from ex post facto punishments; (2) the district court's calculation of the loss under the fraud guideline is not supported by the record; (3) the district court erred by upwardly departing to $7 million from the guidelines range fine of

$125,000. Finally, Bertoli urges that if the case is remanded, it should be reassigned to a different judge.

For reasons we explain in detail below, we will affirm the judgment of conviction but we will vacate the sentence. We decline to order that the case be reassigned to a different judge, and therefore we will remand the matter to the district court for resentencing in accordance with this Opinion.

## I.  INTRODUCTION

On September 29, 1989, a grand jury returned a six-count superseding indictment, charging Bertoli and two co-defendants, Richard Cannistraro and Leo Eisenberg, with violating RICO, 18 U.S.C. § 1961, et. seq., conspiracy to violate RICO, conspiracy to commit securities fraud, and three counts of obstruction of justice. In January 1992, the grand jury returned a second superseding indictment, adding obstruction of justice counts against Bertoli and Cannistraro, based on their alleged continuing efforts to hinder the criminal prosecution. Eisenberg eventually pled guilty to the RICO count of the first superseding indictment, and Cannistraro pled guilty to an information charging him with conspiracy to obstruct justice. Bertoli thus became the sole remaining defendant.

Much of the substantive conduct described at the trial is not generally relevant to this appeal. However, certain evidence is -- evidence of conduct underlying Counts One and Two, which the district court termed the "stock manipulations schemes," and of conduct underlying Counts Three and Six, the

counts of conviction.[1] Essentially, Bertoli and his co-conspirators were charged with unlawfully manipulating the prices of certain stocks. The scheme worked by creating artificial demand, which in turn artificially raised the price of the stocks. For example, Bertoli allocated units of certain initial public offerings of stock ("IPOs") to individuals and entities he controlled. Those players restricted the purchase and sale of the stocks in keeping with Bertoli's and Eisenberg's instructions, thus, essentially setting the price, creating a demand, and ensuring that the price rose. After the prices rose, Bertoli and the others sold their shares at a profit. Additionally, to raise the prices still further, Cannistraro, who was an analyst at the firm of Wood Gundy, Inc., attracted buyers by writing favorable reports about the IPOs.[2]

The third count charged Bertoli with conspiracy to obstruct several criminal and civil investigations into his unlawful securities fraud. The count alleged that he conspired to obstruct: (1) an investigation conducted by the Securities and Exchange Commission ("SEC"), beginning in 1983, of fraudulent and manipulative trading of two stocks; (2) a civil action

_____

[1]. Most of the issues in this appeal involve incidents occurring at trial, and the trial court's responses. We set forth those facts as they become pertinent in the analysis.

[2]. Count One specifically charged that the defendants violated the Racketeer Influenced and Corrupt Organization Act ("RICO"), 18 U.S.C. §§ 1961, et seq., by conducting the affairs of Monarch Funding Corp., a securities brokerage firm in New York City, through a pattern of racketeering activity. Count Two charged the defendants with conspiracy to violate RICO.

brought in 1985 by the SEC against Bertoli and others; (3) a 1985-86 grand jury investigation; (4) a 1987 prosecution against Cannistraro; and (5) the current action.  The conspirators allegedly achieved their object by causing brokers and others to conceal evidence from the investigators and the grand jury.  The count alleged 33 overt acts, consisting of telephone calls between the defendants and others, and false statements by the defendants.  The count alleged that in furtherance of the conspiracy, the defendants destroyed documents relating to certain accounts, filed a false financial disclosure form with the United States Probation Office, transferred funds in the Cayman Islands, and knowingly submitted false affidavits during this prosecution.  Count Six charged that Bertoli and others obstructed justice by transferring certain proceeds of racketeering activity from the Cayman Islands to the Principality of Andorra in Europe, with the deliberate intent to hide their criminal activity and unlawful gains from the United States government.

The case against Bertoli was tried between June 1, 1993, and August 24, 1993.  For the first seven weeks of trial, Bertoli was pro se; thereafter, an attorney entered the case on his behalf.  On August 24, 1993, the jury returned a verdict finding Bertoli guilty of one count of obstruction of justice (Count Six) and one count of conspiracy to commit obstruction of justice (Count Three).  But the jury acquitted Bertoli on all other counts.  Bertoli made a timely motion for a new trial, which the district court denied.  On March 28, 1994, after the

district court imposed the sentence, Bertoli timely filed his notice of appeal.  We have jurisdiction pursuant to 28 U.S.C. § 1291 and 18 U.S.C. § 3742.  The district court had jurisdiction pursuant to 18 U.S.C. § 3231.  We will address the trial issues and the sentencing issues in turn.

## II.  DISCUSSION

### A.  Trial Issues

#### 1.  Adequacy of court's inquiry into jury misconduct

Bertoli first contends that the trial court failed adequately to investigate whether premature jury deliberations prejudiced him.  Bertoli moved for a mistrial on the issue; he also made a post-trial motion for a new trial.  Both motions were denied.

#### a.  Factual background

On August 11, 1993, the court began reading the charge to the jury.  During a recess, Juror Six informed the court that an alternate juror had engaged her in a premature, improper discussion about the merits of the case.  With counsel present, the juror was brought before the court, and the following colloquy ensued:

> THE COURT:  You mentioned to me as I was walking out that somebody mentioned to you an opinion about the case?
>
> THE JUROR:  Correct.
>
> THE COURT:  I don't want to know what it is.  Has that affected your ability to be fair and impartial?
>
> THE JUROR:  I don't think so.  In fact, I'm sure it has not.

App. at 675-76.  The trial court procured from Juror Six the identity of the jurors who engaged her in the premature conversations.  All three of them -- Jurors Thirteen, Fourteen and Fifteen -- were alternates.  One at a time, the court summoned these alternate jurors to the courtroom for questioning by the court in the presence of counsel for both Bertoli and the government.  The record reflects the following conversation between the court and Juror Thirteen:

> THE COURT:  The juror who was just out here indicated to me that you mentioned to her something about the case.  I stress I did not ask her what it is, I do not know what it is, I don't want to know what it is.
>
> I have instructed all the jury not to express or deliberate in any way in the case.
>
> Have you mentioned anything to anybody else about the case?
>
> THE JUROR:  No, I haven't your Honor.
>
> THE COURT:  Again, you can't go into any detail.
>
> I'm going to excuse you from deliberation.  . . .

App. at 677-78.  The court had nearly identical conversations with Jurors Fourteen and Fifteen.  Both of the jurors denied discussing the case with any juror other than Juror Six and the court excused both from their responsibilities as well.

When the court concluded its voir dire, Bertoli moved for a mistrial or, alternatively, either that the court similarly question the other jurors or that Juror Six be excused.  Stating that "[s]he has expressed to me her ability to be fair and impartial and I'm satisfied she can be on that", the court denied

the motions.  App. at 680.  Bertoli's counsel then requested the court to probe further into the intra-jury communications.  The court reiterated its belief that the jury remained untainted, but agreed to "in camera ask each of them what they said and seal it, so the Circuit has it."  App. at 687.  During the next recess, the alternate jurors and Juror Six were called into the judge's chambers for further interviews.  Neither Bertoli nor his attorney was present for this second round of questioning.

The court first interviewed Juror Thirteen.  Because Bertoli relies heavily on this conversation, we quote the transcript extensively:

> THE COURT:  Juror number six, Sheila, Miss Wheil, says that you mentioned something to her and that's what she mentioned to me and that's what I asked you about in court.
>
> You're not a deliberating juror.  From what I know, it's no big deal, but just to satisfy the attorneys out there, I'm putting it on the record. Don't be concerned.
>
> A:  Okay.
>
> Q:  Did you express an opinion as to guilt or innocence?
>
> A:  No.
>
> Q:  You didn't?
>
> A:  No.  That's why I was wondering why I was excused because --
>
> Q:  Everybody would have been excused anyway.  We had all 12 jurors.
>
> Please, don't be upset with me or the process.
>
> A:  I'm not.

First of all, let me say something.  It's been an honor and privilege to be here.  I realize this is the process.  I have learned a lot, I really have.  I learned a lot.  It's been a privilege and I kind of feel violated about what happened today because --

Q:   You know, don't, because from -- you were number 13.  From number 13 to 20, you all knew that.

A:   I understand that.

Q:   You guys did yeomen work. . . .

                    *   *   *

Look, Miss Wheil just mentioned to me that you mentioned something to her about the case and I said, fine, I'll find out about it.

That's why I asked if you mentioned anything to anybody else.  You said you didn't.

I just want to put it on the record so these attorneys have their record.  It will be sealed.

If they want to use it, the Court of Appeals will look at it.  It's no big deal as far as you're concerned.  I'm just trying to maintain the integrity of the process.

A:   I understand.

Q:   Please don't be upset with me.

A:   No, but I would like to tell you what happened.

Q:   Sure.

A:   I pulled in the parking lot this morning, so I waited for her, to walk in the building together.

She says to me, she says, 'How in the hell does he think he's going to get away with this?'

I say to her, I says, 'What are you talking about?  Get away with what?'

She says, 'Bertoli.'

I says, 'Bertoli's innocent until he's proven guilty.'

Q:   That's all you said.

A:   That's what I said.

Q:   It's not a problem.

A:   I'm not going to go through the process of deliberating.  But you have to look at all of the evidence before you can say the man is guilty.

Q:   As you heard my instruction out in court, that's exactly what I told the jury.

A:   This is what I told her this morning.  I walked in the building and that's [sic] was it.

Your Honor, we don't even communicate.  The only reason why I waited for her this morning was because I thought, well, I don't run into her very often, I'll wait for her just to be polite.

Q:   Mr. Bowen, it's no big deal.

A:   But, your Honor, I got a lot of questions I want to ask you.

Q:   I told -- as a matter of fact, once the jurors begin deliberating, I'll bring all the alternates in and we can talk about the case.  That's not a problem. I told you folks we would do that.

When the jury returns its verdicts, I'll sit down and chew the fat with them, too.

That's all I want to do right now is just clear this up.  It's no big deal.  There is no problem.  I see absolutely no consideration.

A.   But there is a problem.  There is a problem.

Q:   Well --

A:   The problem is with her because she's been expressing opinions all along in the trial.  No one has communicated with her.

Q:   Great.  That's terrific.  That's terrific.

A: She's the only one that has expressed an opinion and for the three of us to take the weight, this looks very bad.

Q: No, no, please.

You have to understand, I'm not assessing blame on anyone and the only reason I'm talking to you right now is just to have a record for the lawyers.

A: Your Honor, there's a problem.

Q: Please, there is no problem with you and we can --

A: Just forget it?

Q: You have no problem. I really feel bad that you're upset -- because you have been such -- it's been fun just having you.

A: It has been fun.

I'm not upset. Don't get me wrong if I'm expressing myself that way.

Q: Let it drop. It's no big deal and I want to tell the other two jurors that I feel bad for them, too.

A: It's one of those things.

Q: It's just one of those things.

App. at 689-93.

The in camera examinations of the other two alternate jurors took much less time. The jurors each denied expressing or being told a view as to Bertoli's guilt or innocence. The court then proceeded to question Juror Six:

Q: Have deliberations begun yet?

A: Absolutely not.

Q: . . . Have you prejudged the case?

A: No I have not.

Q:  Are you fair and impartial?

A:  I believe I am.

Q:  And are you ready to begin your deliberations with the jury?

A:  Yes.

Q:  From scratch?

A:  Yes.

Q:  Okay.  There is nothing that would prevent you from being fair and impartial in the case?

A:  No.

Q:  That's it.  Don't worry about it.

App. at 694-95.

Following these conversations, the court made factual findings, outside the presence of the attorneys "for whatever purpose it may be appropriate, for the circuit, if necessary." App. at 696-97.  The court concluded that Juror Six did not prejudge the case, that there had been no outside influence of the jury, and that Juror Thirteen's accusations about Juror Six arose "more out of pique than out of accuracy."  App. at 696. The court found that no one in the jury room had made any determination as to guilt or innocence.  Rather, "if there's been any comment, it may have been sporadic comments on individual witnesses or individual presentation of evidence or the amount of evidence or the manner of the presentation of the evidence."  Id. He concluded that "I am satisfied upon further reflection that

this jury did exactly what it was supposed to do up to the time it began deliberations this afternoon."  App. at 697.

According to its March 28, 1994 Letter Opinion[3] (hereinafter "Opinion") and findings, the court based its determinations on its evaluation of "the demeanor and credibility of all four jurors upon questioning and from general observation of the jury throughout the ten-week trial."  App. at 279.  It found Juror Thirteen's accusations against Juror Six incredible, because "the statement Alternate Juror Thirteen sought to attribute to Juror Six was wholly out of character for her." App. at 281.  Moreover, it contrasted Juror Six's "cool, calm and deliberate" responses with Alternate Juror Thirteen's visible consternation.  App. at 281.

While the interviews and fact-findings were transcribed, the court initially sealed the transcripts.  It released them to the attorneys when the verdicts were returned. Upon receipt of the transcripts, Bertoli made a renewed motion for a new trial based on what he characterized as new evidence, meaning the content of the transcribed conversations.

### b.  Analysis

Bertoli contends that his Sixth Amendment right to a fair trial before an impartial jury has been violated because the district court failed adequately to investigate and assess

---

[3].  The district court issued a 629-page letter-opinion after the sentencing, setting forth the reasons for a variety of its pre-trial, trial and post-trial decisions.

whether premature communications among the jurors about the merits of the case prejudiced him.  The government argues in response that the district court thoroughly and adequately questioned the affected jurors and that the court's findings are in accord with the evidence in the record.

We review a district court's denial of motions for a mistrial and a new trial, as well as its investigation of jury misconduct, for abuse of discretion.  United States v. Resko, 3 F.3d 684, 688 (3d Cir. 1993); Rotondo v. Keene Corp., 956 F.2d 436, 438 (3d Cir. 1992); Government of Virgin Islands v. Lima, 774 F.2d 1245, 1250 (3d Cir. 1985).  That discretion extends to the court's findings on whether the jury misconduct prejudiced the defendant.  Resko, 3 F.3d at 688.

"It is fundamental that every litigant who is entitled to trial by jury is entitled to an impartial jury, free to the furthest extent practicable from extraneous influences that may subvert the fact-finding process."  Waldorf v. Shuta, 3 F.3d 705, 709 (3d Cir. 1993).  Partly to ensure that this right is upheld, "[i]t [has been] a generally accepted principle of trial administration that jurors must not engage in discussions of a case before they have heard both the evidence and the court's legal instructions and have begun formally deliberating as a collective body."  Resko, 3 F.3d at 688; see also United States v. DiSalvo, No. 93-1442, 1994 U.S. App. LEXIS 23727 at *62 (3d Cir. August 31, 1994).  Premature deliberations present a number of dangers, all in some manner affecting or touching upon the

criminal defendant's Sixth Amendment right to a fair and impartial jury trial. In Resko, we identified a number of these:

> (1) Since premature deliberations are more likely to occur before the defendant has had an opportunity to present his or her case, the prosecution has an unfair influence on the juror's initial impressions;
>
> (2) Once a juror has expressed views on a particular issue, that juror has a "stake" in the expressed view and may give undue weight to additional evidence that supports, rather than undercuts, his or her view;
>
> (3) Individual conversations between selected jurors thwart the goal of a collective, deliberative process between the jurors as a group;
>
> (4) Often, the premature deliberations occur before the jurors are instructed on the reasonable doubt standard, and hence the jurors may reach a result using an incorrect, and unconstitutional, standard of proof.

Resko, 3 F.3d at 689-70. Thus, premature deliberations must be guarded against and responded to appropriately. Id. at 689.[4]

In this regard, "'[w]e have recognized that 'voir dire' is the appropriate method for inquiry into possible prejudice or

---

[4]. In Resko, we noted that "the practice has developed that trial judges admonish juries at the outset of trial not to discuss the case with anyone before the conclusion of the trial." Resko, 3 F.3d at 689 (citing cases and commentary).

In this case, the trial court admonished the jurors on a number of occasions. For example, after the parties' respective summations, the court instructed the jury:

> As I cautioned you yesterday, I indicated you should not discuss or deliberate [on] this matter. Although you heard the summations of the attorneys, you've not had the benefit of my charge and I direct that you should not begin deliberations in any way until you've had the benefit of my charge and you're all together in the juryroom.

App. at 274.

bias on the part of jurors, and that the procedure used must provide a reasonable assurance for the discovery of prejudice.'" Waldorf, 3 F.3d at 709 (quoting Government of Virgin Islands v. Dowling, 814 F.2d 134, 139 (3d Cir. 1987)) (also citing United States v. Pantone, 609 F.2d 675 (3d Cir. 1979); United States v. Clapps, 732 F.2d 1148 (3d Cir.), cert. denied, 469 U.S. 1085, 105 S.Ct. 589 (1984); United States v. Jackson, 649 F.2d 967 (3d Cir.), cert. denied, 454 U.S. 1034, 102 S.Ct. 574 (1981)).

Nonetheless, "[t]he particular method of conducting voir dire is left to the sound discretion of the district court." United States v. DiSalvo, 1994 U.S. App. LEXIS 23727 at *57 n.18. Thus, in United States v. Console, 13 F.3d 641 (3d Cir. 1993), cert. denied, ____ U.S. ____, 114 S.Ct. 1660 (1994), we noted that where the trial court has conducted an individualized voir dire, we generally should defer to its handling of the situation. In that case, "the [district] court conducted a corrective voir dire and was 'convinced that there was no prejudicial juror misconduct and . . . that defendants received a fair trial'". Id. at 667 (quoting Clapps, 732 F.2d at 1152) (alteration in original). Hence, we held that the trial court did not abuse its discretion. Id. at 667-68.

There are compelling reasons why the trial court must be given wide latitude to assess and respond to allegations of juror misconduct. "The trial court is obviously in a far better position to observe the impact of premature jury discussions of guilt, and to make a considered judgment as to the effectiveness of a cautionary instruction." Pantone, 609 F.2d at 679; see also

Clapps, 732 F.2d at 1152 (same). After all, "the trial judge develops a relationship with the jury during the course of a trial that places him or her in a far better position than an appellate court to measure what a given situation requires." Government of Virgin Islands v. Dowling, 814 F.2d at 137; see also Resko, 3 F.3d at 690 ("the trial judge has discretion . . . to decide how to deal with a situation in which there is an allegation of . . . premature jury deliberations"); United States v. Thornton, 1 F.3d 149, 155 (3d Cir.) (same), cert. denied, ____ U.S. ____, 114 S.Ct. 483 (1993); United States v. Aiello, 771 F.2d 621, 629 (2d Cir. 1985) (same); United States v. Phillips, 664 F.2d 971, 998 (5th Cir. 1981) (same), cert. denied, 457 U.S. 1136, 102 S.Ct. 2965 (1982).

Of course, even though the trial court is entitled to deference, the reviewing court must satisfy itself that "the district court meaningfully . . . assess[ed] the nature and extent of the jurors' premature discussions in order to ascertain whether there has been any prejudice to the defendants." Resko, 3 F.3d at 690. Consequently, when the district court has failed adequately to ensure that the defendant has not been prejudiced by the improper conduct, we have remanded the case for a new trial. See, e.g., Government of Virgin Islands v. Weatherwax, 20 F.3d 572, 578-79 (3d Cir. 1994) (attorney's failure to request court to investigate the prejudicial effect of jury exposure to extra-record newspaper accounts of trial could constitute ineffective assistance of counsel for habeas corpus purposes); Waldorf, 3 F.3d at 713 (remanding case for new trial on damages

where district court failed to conduct a "searching inquiry into the extent and nature of the prejudicial extrajudicial information that reached the jurors so as to ascertain for itself whether there was a substantial likelihood of prejudice such that a new trial was warranted"); Resko, 3 F.3d at 695 (remanding case for new trial where district court failed to conduct meaningful inquiry into allegations of prejudicial intra-jury communications).

This case is not like those, however, and we do not find that the district court abused its discretion in its response to the allegations of improper intra-jury communications. We further conclude that the district court's finding that the intra-jury communications did not prejudice Bertoli is supported adequately by the record.

In the first place, intra-jury communications pose a less serious threat to a defendant's right to an impartial trial than do extra-jury influences, and therefore district courts are entitled to even greater deference in their responses to them than in responses to outside influences. See, e.g., Resko, 3 F.3d at 690 (citing cases). As we said in Resko:

It has long been recognized that when jurors are influenced by the media and other publicity, or when they engage in communications with third parties, these [outside] influences pose a substantial threat to the fairness of the criminal proceeding because the extraneous information completely evades the safeguards of the judicial process. In contrast, when there are premature deliberations among jurors with no allegations of external influence on the jury, the proper process for jury decisionmaking has been violated, but there is no reason to doubt that the jury based its ultimate decision only on evidence formally presented at trial.

Resko, 3 F.3d at 690 (emphasis in original); DiSalvo, 1994 U.S. LEXIS 23727 at *62 (intra-jury influences less serious than extra-jury influences). Because extra-jury influences are far more serious than intra-jury influences, certain extra-jury influences create a presumption of prejudice that must be rebutted by the government for the court to uphold the conviction. See United States v. Console, 13 F.3d at 666. But cases involving impermissible intra-jury contacts do not create such a presumption. See id. at 666 n.29 (presumption of prejudice not created in Resko because the case "did not involve third-party contact with a juror").

The distinction between extra-jury influences and intra-jury communications is significant, and becomes apparent by comparing the facts of this case with those in Waldorf. In that personal injury case, the plaintiff was rendered a quadriplegic as a result of a motor vehicle accident. During the trial, media reports of a verdict in a similar case, to which the jury was exposed and which they discussed among themselves, "placed before the jury the very same type of information the district court had excluded as inadmissible." Waldorf, 3 F.3d at 707. Thus, the circumstances posed a serious risk that an extraneous and inadmissible newspaper article may have vitiated procedural rulings based on fairness to both sides. In this case, by contrast, and similarly to most cases involving premature deliberations, there is no contention that the jury was exposed to extraneous influences; instead, the concern is that the trial

was tainted because jurors prematurely spoke their views about the evidence they properly were considering. Thus, we should be especially wary about second-guessing the district court in this case.

At any rate, the court did conduct a voir dire of particular members of the jury, and did make findings that the premature deliberations did not prejudice Bertoli. As detailed above, after Juror Six approached the court with her accusations, the court immediately ascertained the identities of the jurors who had engaged her in premature conversations. The court then questioned the four jurors with counsel present, determined that Juror Six was the only juror with whom they conversed about the case, and then disqualified the three alternate jurors. The court also satisfied itself that Juror Six had not prejudged the case.

While Bertoli argues that Juror Six should have been disqualified, we cannot say that the court's finding that she was not tainted by the premature deliberations was clearly erroneous. Indeed, quite the opposite is true. The court examined her twice, and relied on her answers to its questions, her demeanor, her behavior during the trial and the fact that she was the juror who brought the premature deliberations to the court's attention. See, e.g., Clapps, 732 F.2d at 1152 (trial court's decision to remove jurors who spoke to a third juror, but not to remove the third juror, when that juror informed the court about the conversations, was not clearly erroneous).

Similarly, we cannot say that the court's decision to believe Juror Six over Juror Thirteen was clearly erroneous. The trial court had to believe one of the two jurors. And as the court said in its opinion, despite interviews with three alternate jurors, only Juror Thirteen identified Juror Six as the culprit. Moreover, the trial court was entitled to consider the fact that Juror Six volunteered information to the court, while Juror Thirteen did not.

Further, we do not find error in the trial court's denial of counsel's request that it question the other jurors. Because the court believed Juror Six and disbelieved Juror Thirteen, there was no need to investigate further, as the court interviewed all the jurors involved in the misconduct. Of course, Bertoli could -- and does -- argue that the court at any rate should have corroborated its impressions by interviewing the other jurors. But in the first place, "[t]he more speculative or unsubstantiated the allegation of misconduct, the less the burden to investigate." United States v. Caldwell, 776 F.2d 989, 998 (11th Cir. 1985). Second, in these type of situations, the trial court must balance the potential benefits of further investigation against the possible harm of calling attention to a relatively minor situation about which the other jurors may have been unaware:

> '[i]n determining whether to [question jurors] . . ., the court must balance the probable harm resulting from the emphasis such action would place upon the misconduct and the disruption involved in conducting a hearing against the likely extent and gravity of the prejudice generated by that misconduct. We, as an appellate tribunal, are in a poor position to evaluate

> these competing considerations; we have only an
> insentient record before us.'

Thornton, 1 F.3d at 156 (quoting United States v. Chiantese, 582
F.2d 974, 980 (5th Cir. 1978) (alterations in original), cert.
denied, 441 U.S. 922, 99 S.Ct. 2030 (1979)).[5]

It is true that in Resko, we remanded the case for a
new trial because the inquiry into the content and effect of
premature jury deliberations had been inadequate.  But that case
readily is distinguished.  In Resko, the trial court received
information that members of the jury were discussing the case
during recesses and while waiting in the jury room.  The court
denied defense counsel's request that the court conduct an
individualized voir dire of the jurors, instead asking each to
fill out a written questionnaire.  3 F.3d at 687-88.  The
questionnaire asked the jurors simply: (1) whether he or she had

---

[5]. The trial court refused to ask the four jurors about the
substance of their conversations.  Apparently, the trial court
was concerned about violating Fed. R. Evid. 606(b), which
provides that "[u]pon an inquiry into the validity of a verdict
or indictment, a juror may not testify as to any matter or
statement occurring during the course of the jury's deliberations
. . . ."  See app. at 275.  Of course, because the conversations
occurred prior to official deliberations, and because the court
was not inquiring into the validity of a verdict or indictment,
the rule did not apply to the situation in this case.  Cf.
DiSalvo, 1994 U.S. App. LEXIS at **65-66 (rule applies to prevent
judge from inquiring into alleged statements made during
deliberations).  To the contrary, when premature deliberations
have taken place, we have held that it is generally incumbent
upon the district court to inquire into "the nature of the
jurors' discussions."  Resko, 3 F.3d at 691 (emphasis added).
Nonetheless, under the facts of this case, we find no abuse of
discretion.  The court assured itself that the jurors did not
discuss guilt or innocence and had not prejudged the case.
Moreover, the court disqualified the alternate jurors.

discussed the facts of the case with one or more of the other jurors; and (2) if yes, whether, because of those discussions, he or she had formed an opinion about the guilt or non-guilt of the defendants. All the jurors answered "yes" to question 1 and "no" to question 2.

By using a two-question form, the district court was unable "to know the nature of the jurors' discussions and whether these discussions in fact resulted in prejudice to the defendants." Id. at 690. While the questionnaire told the court that each of the jurors engaged in premature discussions, "there [was] no way to know . . . whether they involved merely brief and inconsequential conversations about minor matters or whether they involved full-blown discussions of the defendants' guilt or innocence." Id. at 690-91. In short, the district court -- as well as the reviewing court -- simply had insufficient information upon which to evaluate the allegations. There was no voir dire to review, and there were no reliable findings upon which we could apply a deferential standard. Accordingly we were unable to review the district court's findings at all. As we explained, the need for a remand was "unfortunate" and we limited our holding to the facts of that case, facts which we thought -- and still think -- unlikely to recur. Id. at 695.

Unlike the arguments in Resko, Bertoli's arguments are directed to the method and scope of the trial court's response, rather than to whether a response existed at all. It is also significant that the trial court's findings are corroborated by the nature of the verdict itself. It is

difficult to credit Bertoli's accusations, when the allegedly prejudiced jury acquitted him on most counts of the indictment including the most serious charges.  As we said in an analogous context, "[w]hen the jury is instructed to base its verdict solely on the evidence and it acquits the defendant of certain counts, such factors indicate that the jury was not biased." DiSalvo, 1994 U.S. App. LEXIS 23727 at *69 (citing United States v. Thornton, 1 F.3d at 156).  See also United States v. Gilsenan, 949 F.2d 90, 96 (3d Cir. 1991) (where jury "delivered a fractured verdict . . . among the offenses . . . [w]e cannot conceive in these circumstances tht the allegedly prejudiced information could have had an impact on the verdict"), cert. denied, U.S. ____, 112 S.Ct. 2971 (1992).

In sum, we find no abuse of discretion in the trial court's handling of the allegations of jury misconduct and its finding that the defendant was not prejudiced by the premature jury deliberations.

### 2.  Propriety of the Ex Parte interviews

Bertoli next contends that the trial court erred in conducting ex parte interviews with members of the jury without his presence or the presence of his counsel.  He argues that the error was exacerbated by the fact that the court did not unseal the transcript of the ex parte discussions until after the jury returned its verdict.  Bertoli claims that the trial court's actions violated his rights under the Fifth and Sixth Amendments and his right to be present during all stages of a trial pursuant

to Fed. R. Crim. P. 43. The government responds that Bertoli waived his rights under all of these provisions by failing to object to the in camera interviews when the district court informed the attorneys of its intention to proceed in that manner. Alternatively, the government incorporates the arguments made in the trial court's opinion explaining its decision. As this issue involves solely questions concerning the interpretation of the Federal Rules of Criminal Procedure and the Constitution, our review is plenary. Government of Virgin Islands v. Knight, 989 F.2d 619, 626 (3d Cir.), cert. denied, ____ U.S. ____, 114 S.Ct. 556 (1993).

### a. Fifth Amendment

The due process clause of the Fifth Amendment grants criminal defendants the "right to be present at all stages of the trial where his absence might frustrate the fairness of the proceedings. . . . " Faretta v. California, 422 U.S. 806, 819 n. 15, 95 S.Ct. 2525, 2533 n.15 (1975); United States v. Gagnon, 470 U.S. 522, 526, 105 S.Ct. 1482, 1484 (1985); Snyder v. Massachusetts, 291 U.S. 97, 105-06, 54 S.Ct. 330, 332 (1934). This does not mean, however, that the defendant has a "constitutional right to be present at every interaction between a judge and a juror." Gagnon, 470 U.S. at 526, 105 S.Ct. at 1484. Rather, "'[t]he mere occurrence of an ex parte conversation between a trial judge and a juror does not constitute a deprivation of any constitutional right.'" Id. (quoting Rushen v. Spain, 464 U.S. 114, 125-26, 104 S.Ct. 453,

459 (1983) (Stevens, J., concurring in judgment) (alteration added)).  In particular, and in the absence of some special circumstance, "[i]t is clear that there is no constitutional right for a defendant to be present at a conference in chambers concerning dismissal of a juror."  United States v. Provenzano, 620 F.2d 985, 997-98 (3d Cir.) (emphasis in original) (citing cases), cert. denied, 449 U.S. 899, 101 S.Ct. 267 (1980); see also United States v. Brown, 571 F.2d 980, 986-87 (6th Cir. 1978) (appellants' asserted right to be present at in-chambers conference concerning disqualification of juror "was not constitutionally required").  In fact, as the Supreme Court has intimated, the presence of a defendant with counsel during such a conference well may have a counterproductive effect on the discussion, by impacting on the jurors' willingness to freely discuss the issues.  Gagnon, 470 U.S. at 527, 105 S.Ct. at 1485; United States v. Aiello, 771 F.2d at 629 (in certain circumstances, "the trial judge, aided by his personal observation and appraisal of all persons concerned, may choose a private inquiry in the more relaxed atmosphere of the robing room").

In this case, the trial court's interview with the jurors did not implicate Bertoli's Fifth Amendment rights. First, the in camera conversations constituted the second round of jury interviews, and essentially went over the same ground as the prior voir dire conducted in open court with counsel present. Second, as detailed above, the allegations involved solely intra-jury communications, as opposed to extraneous influences, so the

inquiry was not so significant a part of the trial.  Rather, the
interviews constituted "a short interlude in a complex trial."
Gagnon, 470 U.S. at 527, 105 S.Ct. at 1484; see also Verdin v.
O'Leary, 972 F.2d 1467, 1482 (7th Cir. 1992) ("'Only a trial
fundamentally unfair in light of the entire proceedings violates
the open-ended aspect of [this] constitutional protection.'")
(quotation omitted) (alteration in original); United States v.
Brown, 923 F.2d 109, 112 (8th Cir.) (no constitutional right to
be present at in camera conference between court and jurors),
cert. denied, ____ U.S. ____, 112 S.Ct. 110 (1991).  Finally, we
doubt whether the jurors would have been as comfortable
discussing their conduct had Bertoli been present.[6]  Thus, we
hold that Bertoli had no Fifth Amendment right to be present
during the in camera interviews.


### b.  Rule 43

> Fed. R. Crim. P. 43 provides in pertinent part:
> (a)  Presence Required.  The defendant shall be present
> at the arraignment, at the time of the plea, at every
> stage of the trial including the impaneling of the jury
> and the return of the verdict, and at the imposition of
> sentence, except as otherwise provided by this rule.
>
> (b)  Continued Presence Not Required.  The further
> progress of the trial to and including the return of
> the verdict shall not be prevented and the defendant
> shall be considered to have waived the right to be
> present whenever a defendant, initially present,

---

[6].  The government argues that Bertoli waived any Fifth Amendment
right he may have had.  Because we find that he had no such right
in this case, there was nothing to waive.

>    (1) is voluntarily absent after the trial is
>    commenced . . . .

See also Crosby v. United States, ____ U.S. ____, ____, 113 S.Ct. 748, 751 (1993).

In Gagnon, the Supreme Court expressly declined to address whether Rule 43 guarantees defendants a right to be present during an in camera conference between the trial court and a juror.  Other courts, however, generally have held that a conference between the court and a juror concerning the possible dismissal of a juror does fall within the purview of Rule 43. See, e.g., United States v. Brown, 571 F.2d at 985-87; United States v. Baca, 494 F.2d 424, 428-29 (10th Cir. 1974).  In United States v. Provenzano, we held that when the relevant facts were undisputed and therefore the conference between the court and the juror involved solely a question of law, Rule 43 did not apply. 620 F.2d at 998 (citing Fed. R. Crim. P. 43(c)(3), which provides that "[a] defendant need not be present . . . [a]t a conference or argument upon a question of law").

Nonetheless, regardless of whether the defendant does have such a right, a question we need not decide, it is well settled that the right is subject to both the doctrines of waiver and harmless error.  See, e.g., Gagnon, 470 U.S. at 529, 105 S.Ct. at 1486 (right subject to waiver); Provenzano, 620 F.2d at 998 (right subject to harmless error doctrine).  Here we find that Bertoli waived any right he may have had pursuant to Fed. R. Cr. P. 43.

The trial court's decision to conduct in-camera interviews of the jurors arose in the following context:

> MR. LEVITT [defense counsel]:  I'm still a little concerned about the incident with juror number six and numbers 13, 14 and 15 . . . .
>
> THE COURT:  I understand what you're saying there, but I'm not inclined, and I'll think about as I go into chambers, to require them to discuss it and I'm not giving you or the Government leave to approach the jurors.  I'm specifically telling you you do not.  When I say 'you', I can't look at you both.  The collective you and your agents, do not have the leave to approach these jurors.
>
> If one of the three jurors were a deliberating juror, we might have a different situation, but each fortuitously was an alternate juror.  Each said they did not speak to anybody else and juror number six -- I wish I knew her last name, I mean no disrespect to her, I believe her first name is Sheila -- indicated that it would have no impact on her.
>
> What I will do, I will in camera ask each of them what they said and seal it, so the Circuit has it.

App. at 686-87.  Bertoli's attorney then asked the court to interview other jurors as well.  He made no objection to the decision to conduct in-camera interviews and he did not request to be present.  Only after receiving the transcript of the in camera discussion did Bertoli object to the procedure.

The contemporaneous objection rule, that the failure contemporaneously to assert a right constitutes a waiver of that right, applies to a criminal defendant's right to be present under Rule 43.  Gagnon, 470 U.S. at 529, 105 S.Ct. at 1486; United States v. Brown, 923 F.2d at 112 (failure to assert right under Rule 43 constitutes waiver); United States v. Doe, 964 F.2d 157, 159 (2d Cir.) ("waiver by counsel of a defendant's right to

be present during the proceedings is valid when made in the presence of the defendant"), cert. denied, ____ U.S. ____, 113 S.Ct. 628 (1992); cf. Government of Virgin Islands v. Williams, 892 F.2d 305, 309 (3d Cir. 1989) (under contemporaneous objection rule, a party must object contemporaneously "to any matter believed to be erroneous, at peril of relinquishing the opportunity to challenge that matter on appeal"), cert. denied, 495 U.S. 949, 110 S.Ct. 2211 (1990).

A defendant need not be warned expressly of his or her rights under Rule 43, nor must a waiver exist on the record. Rather, the simple failure to assert the right constitutes a waiver. In Gagnon itself, the trial court had announced its intention to proceed with in camera discussions, and called a recess. The defendants lodged no objections, then or afterwards, and the Supreme Court held that the failure to assert the right constituted a waiver. Gagnon, 470 U.S. at 523, 529, 105 S.Ct. at 1483, 1486. Similarly, in Provenzano, we held that a defendant's failure to object contemporaneously to the court's assertion of an intent to hold an in camera conference without the defendant present constituted a waiver of any right. 620 F.2d at 998, cited with approval in Gagnon, 470 U.S. at 528 n.2, 105 S.Ct. at 1485 n.2.

In this case, the trial court announced its intention to conduct in camera interviews without Bertoli or his counsel present, and Bertoli failed to assert any right under Rule 43.[7]

_____

[7]. Relying on the transcript that the court ultimately released to him, Bertoli contends that even if he consented to in camera

Bertoli nonetheless argues that, based on the transcript, the trial court only stated an intention to interview the alternate jurors and that he was not appraised of the court's intention to interview Juror Six.  In light of the colloquy quoted in the text, this argument is without merit.  It is clear that the court was contemplating interviewing all four jurors.[8]

### c.  Sixth Amendment

Bertoli also contends that the in camera ex parte interviews violated his right to effective assistance of counsel, since the refusal to allow counsel to be present at the conference constituted a constructive denial of the right to an attorney.  The Sixth Amendment provides every criminal defendant with the right to the effective assistance of counsel.  While it may have been preferable to have counsel present, see Aiello, 771 F.2d at 630, and while the district court should have released

(..continued)
interviews, he did not consent to the court's method of conducting the interviews.  It is unfortunate that the trial judge did not release the transcript of the interviews immediately after the in camera conference.  This does not, however, change our analysis.  Our review of the transcript reveals that the court did what it told counsel it would do. What occurs at a conference is not preordained; the possibility of an unforseen revelation always exists.  By waiving his right to be present at the conference, Bertoli took the risk of what might occur.  At any rate, we are satisfied that the record supports the court's credibility determinations.

[8].  At any rate, any error the district court may have committed was harmless.  It is unclear what Bertoli would have gained by being present, other than the opportunity to request again more extensive questioning.  On the other hand his presence may have stifled the jurors.  Overall, we see no prejudice to Bertoli from the procedure followed.

the transcript promptly, we cannot say that Bertoli was prejudiced by the trial court's decision to conduct the interviews without counsel present. In the first place, the responsibility of making the credibility determinations rested with the court, not counsel. See United States v. Marrero, 904 F.2d 251, 261-62 (5th Cir.), cert. denied, 498 U.S. 1000, 111 S.Ct. 561 (1990). Second, counsel did not ask to be present at the interviews when the court announced his intention to hold them. Finally, the interviews were transcribed and the transcript was made available to counsel -- albeit belatedly -- in time for counsel to move for a new trial before the district court itself. See Aiello, 771 F.2d at 629-30 (failure of court to include counsel in in camera discussion with jury constituted harmless error when court held second hearing with counsel present).

### 3. Providing written transcripts to jury

At several points during deliberations, the jury sent notes to the trial court requesting certain testimony. Each time the court overruled Bertoli's objection and provided the transcripts to the jury. It appears that the jury ultimately asked for and obtained the transcripts of the entire testimony of 12 witnesses.

Bertoli argues that the trial court erred in providing the jury with these transcripts. He contends that by acceding to the jury's request, the trial court permitted the risk that the jury would overvalue the written transcripts at the expense of

the other evidence.  He also points to the risks involved should a jury misread the transcripts or rely on one juror's interpretation.

Although we never have ruled on the propriety of providing juries with written transcripts of testimony, we have held that "[a] trial court has broad discretion in deciding whether to accede to a jury's request for a reading of testimony."  United States v. Zarintash, 736 F.2d 66, 69-70 (3d Cir. 1984) (emphasis added); United States v. Chrzanowski, 502 F.2d 573, 577 (3d Cir. 1974) (same); United States v. Rabb, 453 F.2d 1012, 1013 (3d Cir. 1971) (same); United States v. Chicarelli, 445 F.2d 1111, 1114-15 (3d Cir. 1971) (same).  The discretion is limited by two considerations, however:  (1) such requests may slow the trial where the requested testimony is lengthy; (2) when read only a portion of testimony, the jury may give undue weight to that portion.  Still, unless a trial court's refusal to read back testimony is supported by one of these two concerns, "a trial judge abuses his discretion" by denying the request.  Zarintash, 736 F.2d at 70 (citing Rabb, 453 F.2d at 1013-14).

We agree with Bertoli that the providing of written trial transcripts may pose dangers not present when the trial court reads portions of the transcripts to the jury.  For example, when the request is to have testimony read back, the court can ensure that all the jurors are present when the testimony is read.  In the privacy of the jury room, this cannot be done.  But on the other hand, reading back testimony poses

dangers not present when the jury is provided transcripts.  For
instance, an inattentive juror may be persuaded unduly by an
attentive juror's version of the read-back testimony.  Moreover,
a juror's mishearing of read-back testimony cannot be corrected
by a second look.  All in all, we do not believe that the
distinctions between reading testimony to the jury and providing
the jury with copies of written testimony are sufficient so that
we should apply different considerations when reviewing
determinations by the court to supply them.[9]  Cf. Zarintash, 736
F.2d at 70 (implying that distinction between providing written
transcripts and reading testimony is a distinction of form, not
substance).  Therefore, we join the other courts that have
considered this issue and hold that a trial court's decision
whether or not to supply the jury with copies of written
transcripts may be reversed only when it constitutes an abuse of
discretion.  See, e.g., United States v. Edwards, 968 F.2d 1148,
1152 (11th Cir. 1992) ("district court has broad discretion in
determining whether to grant or deny a jury's request to read a
portion of the trial transcript"), cert. denied, ____ U.S. ____,
113 S.Ct. 1006 (1993); United States v. Lujan, 936 F.2d 406, 411
(9th Cir. 1991) (trial court's decision to provide trial
transcript to jury reviewed for abuse of discretion); United
States v. Betancourt, 838 F.2d 168, 175 (6th Cir.) ("the

---

[9].  We are not to be understood to be holding that a court when
presented with a request for written transcripts from a jury is
obliged to require their preparation if they are not otherwise
available.  In this case daily transcripts were prepared.

furnishing of transcripts to a jury is generally well within the district court's discretion"), cert. denied, 486 U.S. 1013, 108 S.Ct. 1748 (1988); Government of Canal Zone v. Scott, 502 F.2d 566, 570 (5th Cir. 1974) (same). Any other rule would constitute an unwarranted intrusion into the district court's discretion to adapt procedures to the situation in the case before it. See, e.g., United States v. Angelo, 153 F.2d 247, 251-52 (3d Cir. 1946) ("It would be both impossible and undesirable to delimit strictly the powers of the trial judge and to set detailed regulations for the conduct of every case.").

Of course, in exercising its discretion to provide written transcripts of testimony, the trial court must be cognizant of dangers that may be present in the particular case. For instance, in their review of a transcript, jurors may seize upon an answer without focusing on limitations or qualifications developed during cross-examination. If the request poses such a danger, the court should give the attorneys an opportunity to make sure that the transcript incorporates all appropriate and relevant aspects of the requested testimony. Moreover, although it did not happen in this case, the district court generally should accompany the transcripts with a cautionary instruction to focus on the entire testimony and evidence.

We further hold that in this case, the trial court did not abuse its discretion by providing the jury with the written transcripts. The jury requested the transcripts of 12 witnesses, so the danger of giving undue weight to particular testimony was minimized. Moreover, Bertoli fails to specify a single example

in the procedure the court followed that presented a
particularized danger of prejudice.  Further, the district court
adequately informed the jury that it was to consider the entire
body of evidence submitted in the case, and not to emphasize
unduly one piece of evidence over another.[10]  See app. at 223-24
n.166.  See also Betancourt, 838 F.2d at 175 (no abuse of
discretion where "the judge carefully informed the jury, in
standard terms, that all of the evidence was to be weighed, and
no undue credence was to be given to any single part of it").

## B.  Sentencing Issues

Bertoli raises several issues concerning the propriety
of his sentence which we will address in turn.  Initially we
observe that because the obstruction of justice activities that
are the subject of Count Six of the Indictment occurred in 1990,
and because the conspiracy charged in Count Three occurred
between 1983 and 1992, the sentence is governed by the United
States Sentencing Guidelines, which apply to all federal crimes
committed after November 1, 1987.  See United States v. Moscony,

_____

[10].  The court informed the jury:

> All of the evidence, regardless of whether I've
> referred to it, regardless of whether counsel referred
> to it in their summations, must be considered by you.
> It makes no difference whether the evidence was offered
> by the [Government] or by [Bertoli].  It was all
> evidence and all of it should be considered by you to
> the extent it helps you decide the issues in this case.

App. at 224 n.166.

927 F.2d 742, 754 (3d Cir.), <u>cert</u>. <u>denied</u>, \_\_\_\_ U.S. \_\_\_\_, 111 S.Ct. 2812 (1991).

### 1.   The district court's calculation of the sentence

The district court calculated Bertoli's total offense level by applying the "grouping" provisions of the 1993 Sentencing Guidelines.  <u>See</u> <u>United States v. Riviere</u>, 924 F.2d 1289, 1303 (3d Cir. 1991).  Section 3D1.1(a) directs the court to combine various counts of conviction into "distinct Groups of Closely Related Counts."[11]  The district court adopted the government's argument that the conduct charged in the two counts should be divided into three groups:  "Group [One] would consist of the three conspiracies to obstruct [F]ederal court proceedings as well as Count [Six].  Group [Two] would consist of the conspiracy to obstruct the [G]rand [J]ury [I]nvestigation.  Group

---

[11].  Although Bertoli was convicted only on two counts, the guidelines mandate that the court consider a count charging a conspiracy to commit two crimes as a conspiracy to commit crime A and a conspiracy to commit crime B.  The district court quoted the example given in the guidelines:

> <u>Example</u>:  The defendant is convicted of two counts: conspiring to commit offenses A, B, and C, and committing offense A.  Treat this as if the defendant was convicted of (1) committing offense A; (2) conspiracy to commit offense A; (3) conspiracy to commit offense B; and (4) conspiracy to commit offense C.  Count (1) and count (2) are grouped together under §3D1.2(b).  Group the remaining counts, including the various acts cited by the conspiracy count that would constitute behavior of a substantive nature, according to the rules in this section.

U.S.S.G. § 3D1.2, Application Note 8.

Three would consist of the conspiracy to obstruct the SEC

Investigation".  App. at 412 (quoting government Sentencing

Memorandum at 77) (alterations in original).  The grouping

guideline then directed the court to compute the offense level

for each group separately, based on the most serious of the

counts comprising the group.[12]

Because each group involved obstruction of justice, the

district court applied section 2J1.2, the guideline covering that

crime.  That guideline, however, contains a cross-reference, to

be applied when a defendant's activity involved "obstructing the

investigation or prosecution of a criminal offense."  Section

2J1.2(c)(1).  In such a case, the court is to sentence the

defendant as an accessory after the fact to the relevant criminal

offenses, if that would result in a greater offense level.  In

other words, if A's obstructionist activity consisted of lying

under oath about whether B committed a bank robbery, A should be

sentenced as an accessory after the fact to bank robbery.

Section 2X3.1, the guideline for accessory after the fact,

---

[12].  Section 3D1.3 requires the court to:

> Determine the offense level applicable to each of the
> Groups as follows:
>
> (a)  In the case of counts grouped together pursuant to
> § 3D1.2(a)-(c), the offense level applicable to a Group
> is the offense level, determined in accordance with
> Chapter Two and Parts A, B, and C of Chapter Three, for
> the most serious of the counts comprising the Group,
> i.e., the highest offense level of the counts in the
> Group.

provides a base offense level of "6 levels lower than the offense level for the underlying offense."

The court, finding that Bertoli conspired to obstruct the criminal proceedings against him, applied the cross-reference provision. Because the underlying crimes involved fraud, the court was referred first to section 2X3.1 and then to section 2F1.1, the guideline covering fraud and deceit. Under the fraud guideline, the court began with a base offense level of 6. But, following the table set forth in section 2F1.1(b)(1), the court increased the offense level by 14, because it found the loss to be between $5 and $10 million.[13] Applying other subsections of the fraud guideline, the court increased the offense level still further.[14] The total offense level for Group One was computed to be 25.

The court similarly computed the offense levels for Groups Two and Three, also by applying the cross-reference provision of the obstruction of justice guideline. The offense levels for each of those groups was 22.

---

[13]. Section 2F1.1(b)(1) provides that "[i]f the loss exceeded $2,000", the court should increase the offense level as described in the table. Section (b)(1)(o) requires the court to increase the level by 14 if the loss was more than $5,000,000 but less than $10,000,000.

[14]. Specifically, because the court found that the offense involved more than minimal planning, it increased the level by 2, pursuant to section 2F1.1(b)(2). And, because the court found that the offense involved a "violation of [a] judicial or administrative order", it increased the level by an additional 2 points pursuant to subsection (b)(3). See also n.15, infra.

Finally, the court applied section 3D1.4, which
provides the following when separate groups are involved:

[t]he combined offense level is determined by taking the offense level applicable to the Group with the highest level and increasing that offense level by the amount indicated in the following table:

| Number of Units | Increase in Offense Level |
|---|---|
| 1 | none |
| 1 1/2 | add 1 level |
| 2 | add 2 levels |
| 2 1/2-3 | add 3 levels |
| 3 1/2-5 | add 4 levels |
| more than 5 | add 5 levels |

In determining the number of Units for purposes of this section:

(a) Count as one Unit the Group with the highest offense level. Count one additional Unit for each Group that is equally serious or from 1-4 levels less serious.

Thus, the court began with the offense level applicable to Group One, and increased that level by 3, 1 level for Group One itself and 2 additional levels because the offense levels for Groups Two and Three were "from 1-4 levels less serious" than Group One. Accordingly, the district court arrived at a total offense level of 28.[15]

---

[15]. In its Opinion, the district court provided the following explanation of its computation of the Total Offense Level:

### Total Offense Level

The total offense level of 28 is calculated as follows:

(1)     Group One Base Offense Level

--      Applicable Guideline: § 2J1.2(c), which by cross-reference to § 2X3.1, requires the offense level to be calculated as if Bertoli was an accessory after the fact to the offenses being prosecuted in the Redacted

## 2. Proper applicable Guidelines Manual

(..continued)
Second Superseding Indictment because he conspired to obstruct the investigations and prosecutions of those offenses.  This requires the use of § 2F1.1

```
--      Base Level
            § 2F1.1(a)                               6
--      Upward adjustment pursuant to
            § 2F1.1(b)(1)(o) for loss between
            $5 and $10 million                       14

--      Upward adjustment pursuant to
            §2F1.1(b)(2) for more than
            minimal planning                         2

--      Upward adjustment pursuant to
            §2F1.1(b)(3)(B) for violation of
            a judicial or administrative order 2
                                               ____         ___
        SUBTOTAL                               24

--      Downward adjustment pursuant to
            § 2X3.1                                  6
                                               ____
        BASE OFFENSE LEVEL                     18

(2)     Upward adjustment pursuant to
            § 2J1.7 for committing an offense
            while on pretrial release            3

(3)     Upward adjustment pursuant to
            § 3B1.1(a) for having an aggrava-
            ting role in the offense             4
                                               ____
GROUP ONE OFFENSE LEVEL                        25

(4)     Upward adjustment pursuant to
            § 3D1.4 for multiple offenses      3
            (taking into account
            Groups Two and Three)              ____

TOTAL OFFENSE LEVEL                            28
```

App. at 444.

Bertoli first contends that the district court's application of the cross reference in the 1993 Guideline for obstruction of justice violated his right to be free from ex post facto punishments, guaranteed by Article I, § 9 of the United States Constitution. We exercise plenary review over the district court's conclusion. United States v. Moscony, 927 F.2d at 754 n.17.

Generally, the sentencing court must apply the Guidelines Manual in effect at the time of sentencing. 18 U.S.C. § 3553(a)(4),(5); U.S.S.G. § 1B1.11(a). However, sometimes this rule gives way to constitutional considerations. Specifically, "where such retroactivity results in harsher penalties, Ex Post Facto Clause problems arise, and courts must apply the earlier version." United States v. Kopp, 951 F.2d 521, 526 (3d Cir. 1991) (citing Miller v. Florida, 482 U.S. 423, 107 S.Ct. 2446 (1987)); see also United States v. Seligsohn, 981 F.2d 1418, 1424 (3d Cir. 1992); United States v. Pollen, 978 F.2d 78, 90 (3d Cir. 1992), cert. denied, ____ U.S. ____, 113 S.Ct. 2332 (1993); United States v. McAllister, 927 F.2d 136, 138 n.2 (3d Cir.), cert. denied, ____ U.S. ____, 112 S.Ct. 111 (1991). Bertoli contends that the court should have used the 1989 Guidelines Manual to calculate the base offense level, because a substantive change to the commentary to the obstruction of justice guideline, resulting in more severe penalties, took effect after the crime of Count Six was completed. We agree.

The district court failed to consider this argument, because, in determining which Guideline Manual to apply, it

grouped the conduct charged in Counts Three and Six, and treated it as one course of conduct.  Apparently, the district court believed that if the conduct is grouped together, there is no need to assess the counts independently to determine whether ex post facto clause considerations arise.  Thus, although finding that the conduct of Count Six occurred in 1990, the court nevertheless held that the crimes were completed in 1992, when the conspiracy's last overt act occurred.  The court reasoned that "the only other Guidelines Manual that could be used [other than the Manual in effect at the time of sentencing] is the 1 November 1991 Manual . . . , which was the manual in effect on the date the Second Superseding Indictment was returned and the conspiracies to obstruct justice described in Count Three ceased."  App. at 405.[16]   Because there is no substantive difference between the 1991 and 1993 Guidelines Manuals, the court applied the 1993 Guidelines Manual.

We expressly have disapproved the practice of combining different counts of the indictment when determining which Guidelines Manual applies.  See Seligsohn, 981 F.2d at 1424.  In Seligsohn, some of the offenses concluded before November 1, 1989, while others took place after that date.  On November 1, 1989, amendments to the guidelines took effect "and provided for the imposition of heavier penalties than those previously in

_____

[16].  On appeal, the government does not endorse the district court's decision to combine Counts Three and Six for the purpose of determining which Manual applies.  Rather, the government's sole argument is that the 1989 Manual is not more favorable to Bertoli than the 1993 Manual.

effect." Id. at 1424. The district court nevertheless applied
the post-1989 Guidelines Manual to all the counts. On appeal,
the government supported the ruling based on a principle set
forth in the Sentencing Guidelines called the one-book rule. The
one-book rule provides that "only one set of Guidelines should be
used in calculating the applicable total 'as a cohesive and
integrated whole.'" Id. (quoting government's Brief). We
rejected the proposition that the one-book rule overrides ex post
facto concerns:

> That so-called rule is inconsistent with United States
> v. Kopp and other cases in this Court. Focusing on ex
> post facto considerations, those cases have prohibited
> the application of more stringent penalties than were
> authorized at the time of the offense. Consequently,
> we expressly disapprove of the 'one book' practice as
> in conflict with the Kopp opinion.

Id. The fact that various counts of an indictment are grouped
cannot override ex post facto concerns. Id. Therefore, the
trial court erred by failing independently to analyze which
Guidelines Manual should have applied to the conduct charged in
Count Three. Our independent analysis of the question leads us
to conclude that the 1989 guidelines apply to Bertoli's
sentence.[17]

---

[17]. A policy statement in the guidelines provides that "[t]he
Guidelines Manual in effect on a particular date shall be applied
in its entirety. The court shall not apply, for example, one
guideline section from one edition of the Guidelines Manual and
another guideline section from a different edition of the
Guidelines Manual." U.S.S.G. § 1B1.11. In Seligsohn, we said
that upon remand, "before grouping the various offenses to
determine the score, the district court must first apply the
applicable Guidelines for each offense." 981 F.2d at 1426. We do
not read this language to be in conflict with the policy
statement. Rather, when ex post facto clause issues arise, while

Section 2J1.2, the guideline for obstruction of justice, provides in both the 1989 and 1993 versions:

§2J1.2.    Obstruction of Justice

(a)  Base Offense Level:  12

\* \* \*

(c)  Cross Reference
(1)    If the offense involved obstructing the investigation or prosecution of a criminal offense, apply §2X3.1 (Accessory After the Fact) in respect to that criminal offense, if the resulting offense level is greater than that determined above.

The district court found that Bertoli's obstructionist conduct involved attempting to conceal the predicate offenses to the racketeering acts with which he was charged.  See app. at 423. The court therefore applied the cross-reference provision of the guideline, which in turn directed it to the guideline for fraud.

While the guideline provision itself is identical in both the 1989 and 1993 guidelines, the commentary was amended

(..continued)
the one-book rule cannot apply to compel application of the later Manual to all counts, it certainly can compel application of the earlier Manual.  Furthermore, in this case the government does not argue that we should apply a Guideline Manual later than the 1989 Guidelines Manual to either Group 2 or Group 3 if we apply the 1989 Manual to Group one.  See n.16, supra.  Therefore the one-book rule should be applied here and the 1989 Guidelines Manual used as to all groups.  We note that it is possible that changes in the guidelines after an offense might both help and hurt the defendant.  In such a situation a defendant might not be able to object to the use of a Guideline Manual adopted after an offense on ex post facto grounds if overall the amendments favored him.  But we are not concerned with that situation here.

effective November 1, 1991.  The "Background" section of the
commentary to the 1989 guidelines stated:  "Because the conduct
covered by this guideline is frequently part of an effort to
assist another person to escape punishment for a crime he has
committed, an alternative reference to the guideline for
accessory after the fact is made." (Emphasis added).  The amended
commentary mandates application of the cross-reference provision
whenever the defendant obstructed justice as "part of an effort
to avoid punishment for an offense that the defendant has
committed or to assist another person to escape punishment for an
offense."  (Emphasis added).  Relying on caselaw interpreting the
1989 guideline, Bertoli argues that the sentencing court was
prohibited from using the cross-reference when the defendant's
conduct was directed to avoid punishment to himself.  The
government responds that the 1991 revision only clarified the
guideline, and the particular circumstances referred to in the
1989 commentary were not intended to be all-inclusive.

We begin our analysis with several propositions.
First, when a crime is covered by the Sentencing Guidelines, the
sentence is computed based not only on the relevant guidelines,
but also on the Sentencing Commission's policy statements and
commentary.  See, e.g., Stinson v. United States, ____ U.S. ____,
____, 113 S.Ct. 1913, 1916 (1993); United States v. Hightower, 25
F.3d 182, 184 (3d Cir. 1994), petition for cert. filed Aug. 29,
1994.  Second, although the principle has been disputed until
only recently, it is now settled that the commentary to the
guidelines is binding on federal courts as controlling law unless

it either (1) violates the Constitution or a federal statute or (2) "is plainly erroneous or inconsistent with the [guideline]." Stinson, ____ U.S. at ____, 113 S.Ct. at 1919 (quoting Bowles v. Seminole Rock & Sand Co., 325 U.S. 410, 414, 65 S.Ct. 1215, 1217 (1945)).[18]  Third, despite the fact that proposed amendments to the guidelines themselves must be submitted to Congress for review, see 28 U.S.C. § 994(p), "[a]mended commentary is binding on the federal courts even though it is not reviewed by Congress".  Stinson, ____ U.S. at ____, 113 S.Ct. at 1919 (emphasis added).  Finally, "prior judicial constructions of a particular guideline cannot prevent the Commission from adopting a conflicting interpretation" that is consistent with the Constitution and federal law and when "the guideline . . . will bear the construction."  Id. at ____, 113 S.Ct. at 1919.

Applying these principles to the issue before us, it becomes clear that commentary to the guidelines is to be treated (except in narrow instances) as law, that is, it must be read in conjunction with the guideline and policy statements as the law governing the case.  This means that, in the wake of Stinson, subsequent amendments to the commentary -- while binding on the court -- may, just like the guidelines themselves, present ex post facto problems when applied retrospectively.  See, e.g., United States v. Diaz, 26 F.3d 1533, 1544 (11th Cir. 1994)

---

[18].  In Stinson, the Supreme Court, after considering various analogies, concluded that "the guidelines are the equivalent of legislative rules adopted by federal agencies." Id. at ____, 113 S.Ct. at 1919.

(sentence based on commentary enacted after conviction but prior to sentence may run afoul of ex post facto clause); United States v. Carroll, 6 F.3d 735, 747 n.9 (11th Cir. 1993) ("in light of the Supreme Court's decision in Stinson . . . , application of an intervening Guidelines interpretation by commentary promulgated after the offense could run afoul of the Ex Post Facto Clause") (citation omitted), cert. denied, ____ U.S. ____, 114 S.Ct. 1234 (1994); United States v. Wilson, 993 F.2d 214, 216 (11th Cir. 1993) (same).

Of course, an amendment to the commentary does not necessarily substantively alter the guideline itself -- even when its application results in a sentence more severe than might otherwise have been imposed. Rather, "amendments that clarify, rather than substantively change, the guidelines do not present ex post facto issues when they are applied retrospectively." United States v. Webster, 996 F.2d 209, 211 n.4 (9th Cir. 1993) (quoting United States v. Scarano, 975 F.2d 580, 587 (9th Cir. 1992) (internal citations omitted)); see also U.S.S.G. § 1B1.11 ("if a court applies an earlier edition of the Guidelines Manual, the court shall consider subsequent amendments, to the extent that such amendments are clarifying rather than substantive changes"). Because the commentary and the guideline both are binding, however, we must not be too quick to hold that an amendment to the commentary is merely a clarification. Rather, our role is to look at the guidelines manual in effect at the time the crime was committed and ask whether, as matter of construction, the guideline and commentary in effect at that time

is really consistent with the amended manual.  If the amended commentary "does not overrule prior constructions of the Guideline but instead confirms our reading of the Guideline", there is no ex post facto concern.  Diaz, 26 F.3d at 1545 (citing Carroll, 6 F.3d at 746 n.9).  If, though, the amended commentary does overrule prior judicial constructions of the guideline, ex post facto clause problems become more serious.

In this case, the 1989 commentary is clear: "Because the conduct covered by this guideline is frequently part of an effort to assist another person to escape punishment for a crime he has committed, an alternative reference to the guideline for accessory after the fact is made." (Emphasis added).  The government's argument that the commentary simply provides one example of when the cross-reference can be used is at odds with the plain meaning of the language.  The commentary does not purport to give an example; it explains how and when the cross-reference should be applied.  Thus, even though the guideline itself refers only to "obstructing the investigation or prosecution of a criminal offense", when that language is read in conjunction with the commentary, the court is told to use the cross-reference when the defendant's obstructionist activity was directed at assisting another person to escape punishment for a crime.

Our reading is consistent with other courts' interpretations.  The several courts that have addressed the issue under the 1989 guidelines have reached a single conclusion -- that the cross-reference does not apply when a defendant's

obstructionist activity is intended to protect only himself.  For instance, in United States v. Huppert, 917 F.2d 507 (11th Cir. 1990), the defendant had attempted to persuade two witnesses to his crimes to identify someone else to the grand jury.  The Court of Appeals for the Eleventh Circuit, after finding that the obstructionist act "is an act directed at protecting [the defendant] from being punished", cited the 1989 commentary and held that use of the cross-reference was improper.  Id. at 510–11.  Similarly, in United States v. Berkowitz, 712 F. Supp. 707, 709 (N.D. Ill. 1989), the defendant, while facing mail fraud and tax fraud charges in the Northern District of Illinois, was arrested and charged with stealing and destroying documents that he knew were material to that prosecution.  The government sought to use section 2J1.2's cross-reference, but the court declined.

It reasoned:

> Applying §2X3.1 in the instant case would result in treating Berkowitz as an accessory to his own alleged tax fraud and mail fraud.  The official comments to §2J1.2 indicate that such an application of §2X3.1 is not appropriate.  Therein, the Commission explains that §2X3.1 is applied in obstruction of justice cases [b]ecause the conduct covered by the [obstruction of justice] guideline is frequently part of the effort to assist another person to escape punishment for a crime he committed.  Since Berkowitz did not commit obstruction of justice to assist another person, §2X3.1 is inapplicable.

Id. at 709 (quoting commentary) (alterations in original).  See also United States v. Pierson, 946 F.2d 1044, 1048 (4th Cir. 1991) (applying identical reasoning to section 2J1.3(c), the guideline for perjury and subornation of perjury); cf. United States v. Curry, 977 F.2d 1042, 1059 (7th Cir. 1992) (rejecting

the defendant's argument based on Huppert and Pierson because the defendant "was clearly trying to protect others, and not himself . . . "), cert. denied, ____ U.S. ____, 113 S.Ct. 1357 (1993).[19] Thus, this is not a case where the commentary is in accord with prior constructions of the guideline. See Diaz, 26 F.3d at 1545.

These interpretations of the 1989 guideline and commentary are hardly surprising. After all, use of the cross-reference in this case (and in others like it) enabled the court to sentence Bertoli as an accessory after the fact to the crimes for which he was charged and acquitted as a principal. While the "real offense" approach of the guidelines certainly permits the court to consider such facts in computing the sentence, see United States v. Ryan, 866 F.2d 604, 609 (3d Cir. 1989), such an interpretation is hardly the most obvious reading of the 1989 guideline, particularly in light of the commentary. Moreover, it is at least anomalous to hold -- in the absence of explicit direction such as that now provided in the amended commentary -- that the defendant could be convicted as both a principal and an accessory after the fact to his or her own crime. As the court reasoned in Huppert:

> We agree with the district court's conclusion that a sentencing court 'is permitted to look beyond the four corners of the charge to the underlying conduct.' That

---

[19]. In United States v. Jamison, 996 F.2d 698 (4th Cir. 1993), the court noted that "[i]n 1991, the Guidelines Commission amended the commentary on which both the Pierson and Huppert courts relied in a manner which casts doubt upon the continued validity of those decisions." Id. at 701 n.3. However, because the court distinguished those cases, it "reserve[d] for another day a decision on the impact of the amended commentary on our precedent." Id.

> practice is clearly permissible under the guidelines.
> However, under the guidelines, relevant conduct is
> incorporated into the base offense level by a
> prescribed process. . . . Section 2J1.2(c)(1) provides
> a specific method by which a court may consider conduct
> outside the offense of conviction. That method is
> consistent with our understanding of the law of
> principals and accessories.

Huppert, 917 F.2d at 511 (citations omitted) (emphasis added).[20]

In other words, the amended commentary (while certainly not violative of the Constitution or federal law) is in accord neither with the prior case law nor an obvious reading of the guideline. Therefore, we hold that the 1991 amendment to the commentary is not a clarifying amendment but, rather, a substantive change. This means that the district court should have applied the 1989 Guidelines Manual, and should not have used

---

[20]. The government argues that our interpretation would lead to absurd results, because "low-level conspirators in this scheme . . . who assisted Bertoli in hiding his illegal millions, would be eligible to receive a base offense level as high as 20 . . . while Bertoli, the mastermind of the scheme, would be limited to a base offense level of 12." Appellee Br. at 39. Of course, 12 is the base level for obstruction of justice without use of the cross reference. The government neglects to point out, however, that Bertoli would be chargeable and answerable for the entire underlying scheme, whereas the low-level conspirator may not be. See, e.g., United States v. Collado, 975 F.2d 985, 992 (3d Cir. 1992) (liability of defendant for co-conspirator's conduct depends "upon the degree of the defendant's involvement in the conspiracy and, of course, reasonable foreseeability with respect to the conduct of others within the conspiracy"). The point of the cross-reference is to say to someone who, for example, lies for another: we're going to treat you as though you actually helped that person commit the crime you're now helping him get away with. In any event the cases and principles we cite compel our result.

the cross-reference provision of the obstruction of justice guideline.[21]

Because by using the 1993 Guidelines Manual, the trial court imposed a sentence in excess of what would have been permissible under the 1989 Manual, the sentence imposed violated Bertoli's right against ex post facto punishment.  The sentence

[21]. We are aware that the Sentencing Commission has described the amendment as clarifying.  United States Sentencing Commission 1993 Guidelines Manual, app. C, page 233-34, § 401.  But this circumstance does not change our result.  In the first place, we have rejected the proposition that the Sentencing Commission's description of an amendment as "clarifying" is entitled to substantial weight.  United States v. Menon, 24 F.3d 550, 567 (3d Cir. 1994).  Moreover, the Commission's description comes in the face of a settled interpretation of the guideline and therefore is entitled to little weight.  See United States v. Menon, 24 F.3d at 567 ("[W]e never have held that a 'clarifying' amendment can be used to interpret an earlier guideline when applying the amendment would punish the defendant more harshly than he would have been punished under the court's independent interpretation of the pre-amendment language."  Rather, our own independent interpretation of the pre-amendment language is controlling.

To analogize, in McNally v. United States, 483 U.S. 350, 107 S.Ct. 2875 (1987), the Supreme Court held that a person could not be prosecuted under the mail fraud statute for fraud that only causes intangible loss, such as depriving the public of honest government.  In 1988, Congress responded to the Court's decision by passing a statute that defines "scheme or artifice to defraud" as including "scheme[s] or artifice to deprive another of the intangible right of honest services."  18 U.S.C. § 1346.  Of course, simply by adopting this language, Congress could not have the law applied retroactively.  Rather, applying the revised statute to conduct occurring after McNally but prior to the revision clearly would have violated the ex post facto clause.  See, e.g., United States v. Schwartz, 924 F.2d 410, 418 (2d Cir. 1991).  Had Congress described the statute as "clarifying", it would have been of no moment.  That description could not displace the fact that the Supreme Court had ruled on the meaning of the pre-revision language.  In the instant case, the Commission's description comes in the face of a settled interpretation of the guideline provision.  The use of the word "clarifying" cannot change this simple fact.

therefore must be vacated and the matter remanded for re-sentencing under the 1989 Manual.[22]

### 3.  **Permissibility of the fine**

Bertoli next contends that the district court erred in departing upward from the guideline maximum fine of $125,000 to a fine of $7 million.  The district court arrived at this figure as the amount necessary to disgorge Bertoli of illegal profits he keeps hidden in foreign bank accounts.  Bertoli argues that the facts upon which the district court based its decision simply are not supported by the record.

Generally a defendant must be sentenced within the applicable guideline range.  However, if the court "finds that there exists an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines, that should result in a sentence different from that described", the court may depart from the guideline range accordingly.  18 U.S.C. § 3553(b); United States v. Kikumura, 918 F.2d 1084, 1098 (3d Cir. 1990).[23]  Conversely, if the Sentencing Commission adequately

---

[22].  Because the district court was incorrect in its application of the cross-reference, the fraud guideline should not have been applied.  Therefore, we need not address Bertoli's argument that the district court's calculation of the loss under the fraud guideline was erroneous.

[23].  While this case involves a departure from the applicable fine range rather than the incarceration range, we previously have held that this is a distinction without a difference. United States v. Seale, 20 F.3d 1279, 1287 (3d Cir. 1994) (citing United States v. Graham, 946 F.2d 19, 21 (4th Cir. 1991)).  Thus,

took all the relevant factors into account in determining the sentence, the court may not depart.

Our review over a district court's decision to depart upward is divided into three tiers. First, we exercise plenary review over the district court's determination that the Sentencing Guidelines have not adequately taken a particular factor into account. United States v. Uca, 867 F.2d 783, 786 (3d Cir. 1989). "Of course, the circumstances relied upon must in fact exist in the case under consideration" in order to uphold the departure. Kikumura, 918 F.2d at 1098. In reviewing findings of fact, we employ the clearly erroneous standard of review. Finally, we must determine whether the sentence imposed was reasonable, that is, whether the factors on which the court relied and the degree of the departure, were appropriate. In this determination, "the district courts are entitled to exercise a substantial amount of discretion." United States v. Ryan, 866 F.2d at 610; see also Kikumura, 918 F.2d at 1098 ("[a]t this stage of the inquiry, our review is deferential"). We will address these factors in turn.

**a. Taken into Consideration by the Sentencing Commission**

Under the Sentencing Guidelines, the sentencing court "shall impose a fine in all cases, except where the defendant establishes that he is unable to pay and is not likely to become

(..continued)
we review both types of departures under the same analytical rubric.

able to pay any fine."  U.S.S.G. § 5E1.2; United States v. Demes,

941 F.2d 220, 223 (3d Cir.), cert. denied, ____ U.S. ____, 112

S.Ct. 399 (1991).  The court is to consider an array of factors,

including evidence of the defendant's ability to pay the fine,[24]

any restitution or reparation that the defendant has made or is

obligated to make, and "any other pertinent equitable

considerations."  U.S.S.G. § 5E1.2(d).  "The amount of the fine

should always be sufficient to ensure that the fine taken

together with other sanctions imposed, is punitive."  U.S.S.G. §

5E1.2(e).  The guideline provides a "fine table" which

establishes a minimum and maximum fine based on the defendant's

offense level.  For an offense level of 28 -- the offense level

at which the district court arrived in this case -- the minimum

fine is $12,500 and the maximum is $125,000.  U.S.S.G. §

5E1.2(c)(3).

The district court found that in establishing the

guideline range, the Sentencing Commission did not adequately

take into account facts fitting the circumstances of this case.

In so holding, the district court relied on the commentary

---

[24]. The court found that Bertoli was able to pay the fine, for the following reasons:  (1) Bertoli did not submit a financial disclosure form to the probation department; (2) Bertoli's home conservatively is valued in excess of $1,000,000; (3) in October, 1983, Bertoli stashed millions of dollars in secret bank accounts in the Cayman Islands and other off-shore accounts; (4) Bertoli moved millions of dollars out of the Cayman Accounts into accounts in Andorra; and (5) Bertoli is in control of those funds in Andorra.  App. at 451-52.  While Bertoli does challenge the district court's conclusions as to his control over the Andorra funds, he seems not specifically to challenge the district court's finding that he is able to pay the fine.

itself, which expresses the Commission's views on just this subject:

> The Commission envisions that for most defendants, the maximum of the guideline fine range from subsection (c) will be at least twice the amount of gain or loss resulting from the offense.  Where, however, two times either the amount of gain to the defendant or the amount of loss caused by the offense exceeds the maximum of the fine guideline, an upward departure from the fine guideline may be warranted.

The Commission's views are dispositive on this point.  See Kikumura, 918 F.2d at 1104 ("'In determining whether a circumstance was adequately taken into consideration [so as to preclude departure], the court shall consider only the sentencing guidelines, policy statements, and official commentary of the Sentencing Commission.'") (quoting 18 U.S.C. § 3553(b)) (alterations in original).  Assuming the district court's findings are correct, this case involves precisely the type of situation warranting an upward departure contemplated by the Sentencing Commission.  The Commission contemplated the fine of $125,000 to be twice the amount of the gain, whereas the court found that Bertoli illegally profited and controls $7 million.  Thus, the district court was correct in its conclusion that the facts it found warranted an upward departure.

### b.  The district court's factual findings

We next address whether the district court's findings of fact are clearly erroneous.  As a preliminary matter, however, the record compels us to discuss the appropriate evidentiary standard.

In making its findings, the district court employed a standard of proof of "at least a preponderance of the evidence." App. at 372. The court determined that it could consider hearsay statements it regarded as having "some minimal indicium of reliability." App. at 372 n.233 (quoting United States v. Kikumura, 918 F.2d at 1102 (quotation omitted)). In the court's view, two of the documents -- the Cahill Sentencing Affidavit and the 1993 Cannistraro Plea Allocution -- had "more than a 'minimal indicium of reliability'; they are strongly reliable sources." App. at 372 n.233.

Generally, courts may use the preponderance of the evidence standard of proof in sentencing hearings. McMillan v. Pennsylvania, 477 U.S. 79, 91, 106 S.Ct. 2411, 2419 (1987); Kikumura, 918 F.2d at 1099; United States v. McDowell, 888 F.2d 285, 291 (3d Cir. 1989). This is because after a jury finds a defendant guilty, the presumption of innocence no longer applies, and the protections that form a corollary to that presumption become less important. See, generally, Kikumura, 918 F.2d at 1099-1100. See also id. at 1100 (federal rules of evidence inapplicable at sentencing); United States v. Baylin, 696 F.2d 1030, 1040 (3d Cir. 1982) (hearsay admissible at sentencing so long as it bears "some minimal indicium of reliability beyond mere allegation").

In Kikumura, however, we distinguished between "run-of-the-mill sentencing cases" and those in which the proposed departure is so great that the sentencing hearing "functions as 'a tail which wags the dog of the substantive offense.'"

Kikumura, 918 F.2d at 1100-01 (quoting McMillan, 477 U.S. at 88, 106 S.Ct. at 2417).  In Kikumura itself, the sentencing court departed from the guideline maximum of 33 months to 30 years.  We held that in such an extreme context, "a court cannot reflexively apply the truncated procedures that are perfectly adequate for all of the more mundane, familiar sentencing determinations." Id. at 1101.  Rather, we held that facts supporting the departure must be found by clear and convincing evidence.  Hearsay, we said, only may be admitted in such cases when the court examines the "totality of the circumstances, including other corroborating evidence, and determines whether the hearsay declarations are reasonably trustworthy."  Id. at 1103.

We recently applied this heightened evidentiary standard to a district court's upward departure in determining the amount of a fine.  Seale, 20 F.3d at 1288.  There, the district court increased the defendant's fine from the guideline maximum of $250,000 to the statutory maximum of $1,750,000.  We held that this seven-fold increase was just the sort of "extreme context" that warranted use of the higher standard of proof. Such a context, we concluded, "requires that the district court use a clear and convincing standard of proof when finding supporting facts."  Id. at 1288 (citing Kikumura, 918 F.2d at 1100-1102 and United States v. Townley, 929 F.2d 365 (8th Cir. 1991)); see also United States v. St. Julian, 922 F.2d 563, 569 n.1 (10th Cir. 1990) ("If the difference between the guideline range and the departure sentence is great, the trial court should consider the implications of that disparity in determining the

appropriate standard of proof for the facts considered in sentencing.").

In this case, the court departed upward by a factor in excess of 50. This is clearly the type of "extreme context" that requires more than the bare minimum of procedural protections. We hold, then, that factual conclusions justifying the departure must be supported by clear and convincing evidence and that, in order to be admissible, hearsay declarations must be reasonably trustworthy in light of the totality of the circumstances, including other corroborating evidence.

Accordingly we address whether the district court's findings are clearly erroneous in light of this evidentiary standard. The court found made the following findings. Bertoli, Cannistraro and Eisenberg each had companies created for them in the Cayman Islands by Sidney Coleman of Paget Brown & Co., to which they transferred profits obtained through the stock manipulation schemes. In November 1989, the United States govenment requested from the Grand Court of the Cayman Islands documents and evidence concerning these accounts for use in the prosecution against Bertoli. Soon thereafter, Bertoli began meeting with an Ernest Foster to discuss how to move the money and documents concerning the three companies from the Cayman Islands and therefore out of the government's reach. In the wake of these discussions, Foster and two other persons travelled to the Principality of Andorra and opened an account with an Andorran bank in the name of Fosca, S.A. In response to Bertoli's request, Foster ensured that Andorra had no treaty with

the United States that would enable the latter to have access to the accounts. Bertoli then met with Eisenberg and the two decided to move documents concerning the companies to Foster's control. In 1990, the administration of the companies was transferred from Coleman to Foster. The total amount of the funds over which Foster obtained control was $8,700,000. Of that amount, $5,086,593.94 was from Cannistraro's company, $3,132,956.09 from Eisenberg's company, and $471,580.61 from Bertoli's company. Foster arranged to have the funds transferred to the Fosca account. The next year, at Bertoli's request, Foster took the relevant documents to Andorra and left them with an attorney.

The court further found that despite Eisenberg's and Cannistraro's respective plea agreements to forfeit their interests in the Andorran companies to the government, the government to date had collected only $789,083.89. Finally, the court noted that, according to the presentence report, Bertoli does not deny having control over substantial funds.[25] The court inferred from these facts that "as demonstrated by the Government, Bertoli retains control of the millions of dollars, forfeited to it by Eisenberg and Cannistraro, but removed by Bertoli to Andorra beyond its reach." App. at 451. Therefore,

---

[25]. Actually, the court's opinion states that Bertoli "takes no position regarding the Government's claim that 'Bertoli has access to millions of dollars in foreign bank accounts.'" App. at 451 (quoting December 1, 1993 letter from Bertoli). According to the government's brief and the presentence report, however, Bertoli only declined to deny having access to substantial funds.

the court concluded, "[a]n upward departure is necessary in calculating the appropriate fine for Bertoli because the fine indicated by the Guidelines is inadequate to 'disgorge' the gain of Bertoli's criminal activities." Id.

Our review of the record compels us to conclude that the court's findings are not supported by the record and therefore are clearly erroneous. The evidence supporting the proposition that Bertoli controls the entire millions of dollars consists solely of Foster's trial testimony. And his testimony simply cannot be read fairly to confirm the court's findings. Foster did testify that he received control of the funds, that he set up an account in Andorra, and even that he ensured that the United States "didn't have any treaties with or any previous precedent of going in and obtaining documents or information concerning bank accounts." App. at 35. But nothing he says indicates that Bertoli received control of the entire money or that Bertoli retains control of the funds. While he testified that his contacts were with Bertoli rather than with Eisenberg or Cannistraro, he does not even purport to express the view that Bertoli was acting unilaterally. Apparently, the court to reach its conclusions extrapolated from the fact that the government has obtained only partial payments from the two co-conspirators, and that Bertoli did not deny having control over substantial sums of money. "A substantial amount of money" is not always equivalent to many millions, though. And the court's assumption that because the government only collected part of Eisenberg's and Cannistraro's profits, Bertoli must control the rest is

completely speculative.  While such speculation may have survived

scrutiny under the preponderance of the evidence standard, it

certainly cannot withstand scrutiny under the clear and

convincing evidence standard.[26]  Accordingly, the district

court's finding is clearly erroneous and must be vacated and the

case must be remanded for recalculation of the fine.[27]  Because

of this finding, we need not reach the third tier of a review of

an upward departure, whether the extent of the departure was

reasonable.


### 4.  Reassignment to a different judge

Finally, Bertoli argues that in the event of a remand,

the case should be reassigned to a different judge, "because of

the district judge's extreme animus towards Mr. Bertoli."

Appellant Br. at ii.  The government argues in response that

Bertoli wants Judge Lechner recused solely because of his

reputation as a "harsh" sentencer, and that "Bertoli's blatant

attempt at judge-shopping should be rejected by this court."

This is not the first time Bertoli has sought Judge

Lechner's recusal.  On November 2, 1989, Bertoli filed his first

recusal motion.  Judge Lechner denied this motion on March 22,

---

[26].  Although, as noted above, the district court found that the
Cahill sentencing affidavit and the Cannistraro plea allocution
were highly reliable, there is no indication that those documents
were relevant to the district court's finding that Bertoli
controls $7 million.

[27].  Of course, since, as detailed above, the district court's
calculation of the offense level was erroneous, the guideline
range for the fine may well be different next time around.

1990, see United States v. Eisenberg, 734 F. Supp. 1137, 1167 (D.N.J. 1990), and denied it again on April 12, 1990, on a motion for reconsideration, see United States v. Eisenberg, 734 F. Supp. 1168 (D.N.J. 1990). We then denied Bertoli's petition for a writ of mandamus on May 18, 1990, seeking Judge Lechner's disqualification.

On July 26, 1990, Bertoli joined in a recusal motion made by his co-defendant Cannistraro. Judge Lechner denied the motion on August 16, 1990, and we dismissed Bertoli's subsequent appeal. On July 26, 1991, Judge Lechner denied another motion for recusal filed on March 12, 1991. See United States v. Eisenberg, 773 F. Supp. 662, 733 (D.N.J. 1991). Bertoli's December 17, 1992 recusal motion was denied on January 12, 1993. On April 23, 1993 we declined to grant Bertoli's petition for a writ of mandamus. Bertoli's petition for a writ of certiorari to the United States Supreme Court was denied on October 4, 1993, see Bertoli v. United States District Court for the District of New Jersey, ____ U.S. ____, 114 S.Ct. 77 (1993). Finally, Bertoli moved to recuse Judge Lechner from the sentencing but Judge Lechner denied that motion on March 28, 1993.

Our authority to reassign a case on remand stems from two sources. The first stems from the federal recusal statute, 28 U.S.C. § 455. Second, our statutory authorization pursuant to 28 U.S.C. § 2106, to "require such further proceedings to be had as may be just under the circumstances" gives us the "ability to assign a case to a different judge on remand." Liteky v. United States, ____ U.S. ____, 114 S.Ct. 1147, 1156-57 (1994).

Bertoli conflates the two provisions in a single argument -- that Judge Lechner's apparent repeated hostility to him renders the judge unable to preside over a fair trial, and at any rate creates a belief of bias and partiality in the mind of the objective observer.  We will address the bases for recusal separately.

Pursuant to 28 U.S.C. § 455(a) a federal judge must "disqualify himself in any proceeding in which his impartiality might reasonably be questioned."  See Liteky, ____ U.S. at ____, 114 S.Ct. at 1150.  Section 455(b)(1) requires disqualification where the judge "has a personal bias or prejudice concerning a party."  The Supreme Court recently held that subsection (b)'s "extrajudicial source" doctrine also applies to subsection (a). Liteky, ____ U.S. at ____, 114 S.Ct. at 1157.  Under that doctrine, bias, in order to form the basis for recusal, must stem from a source outside of the official proceedings.  Because the focus is on the source of the judge's views and actions, "judicial rulings alone almost never constitute a valid basis for a bias or partiality motion" because they almost never arise from an extrajudicial source.  Id. at ____, 114 S.Ct. at 1157 (citing United States v. Grinnell Corp., 384 U.S. 563, 583, 86 S.Ct. 1698, 1710 (1966)).  Similarly, and for the same reason, "judicial remarks during the course of a trial that are critical or disapproving of, or even hostile to, counsel, the parties, or their cases, ordinarily do not support a bias or partiality challenge."  Id. at ____, 114 S.Ct. at 1157.

Despite finding an extra-judicial source requirement under section 455(a), the Liteky Court held that opinions formed during a judicial proceeding may in certain instances give rise to a duty to recuse. The court reasoned that if during "a lengthy trial . . . the presiding judge for the first time learns of an obscure religious sect, and acquires a passionate hatred for all its adherents," the fact that the beliefs arose through a judicial proceeding is of no consequence. Id. at ____, 114 S.Ct. at 1154. The duty to recuse would arise. This is because the words "extrajudicial bias" really are intended to convey the notion of a "wrongful or inappropriate" bias, regardless of whether the improper bias arises from evidence adduced at trial or from some extraneous source. "A favorable or unfavorable predisposition can . . . deserve to be characterized as 'bias' or 'prejudice' because, even though it springs from the facts adduced or the events occurring at trial, it is so extreme as to display clear inability to render fair judgment." Id. at ____, 114 S.Ct. at 1155. In order for such bias to create a duty to recuse, however, the court's actions must "reveal such a high degree of favoritism or antagonism as to make fair judgment impossible." Id. at ____, 114 S.Ct. at 1157. Of course, section 455(a), by providing for recusal when a judge's impartiality may "reasonably be questioned" still mandates an objective rather than a subjective inquiry. See id. at ____, 114 S.Ct. at 1156 n.2 ("The judge does not have to be subjectively biased or prejudiced, so long as he appears to be so.") (emphasis in original); Alexander v. Primerica Holdings, Inc., 10 F.3d 155,

162 (3d Cir. 1993) ("[T]he public's confidence in the judiciary, which may be irreparably harmed if a case is allowed to proceed before a judge who appears to be tainted", requires that "justice must satisfy the appearance of justice.") (quoting In re Asbestos Litig., 977 F.2d 764, 776 (3d Cir. 1992)).

Bertoli makes no allegation that Judge Lechner derived his bias from an extrajudicial source. Rather, all the incidents he cites in his brief involve rulings and statements made by the judge during the proceedings. Thus, these incidents will not support recusal unless, looked at objectively, "they display a deep-seated favoritism or antagonism that would make fair judgment impossible."

We previously have commented on the antagonisms between Judge Lechner and Bertoli and his various attorneys. When deciding a prior interlocutory appeal on May 7, 1993, we said:

> Perhaps understandably, the record in this case hints at some animus between the court and Bertoli and Bertoli's counsel. Bertoli has sought recusal on several occasions. He has called into question the district judge's ability to adjudicate fairly his pretrial motions. Some of the exchanges at the hearings the district court has already held indicate that this case has been contentious.

United States v. Bertoli, 994 F.2d 1002, 1025 (3d Cir.), cert. denied, ___ U.S. ___, 114 S.Ct. 77 (1993). We cautioned counsel and the court to "strive to avoid even the hint of rancor." Id. at 1027. It is unfortunate that the rancor nevertheless continued.

But yet we do not believe the record indicates the type of bias that would warrant Judge Lechner's recusal from this

case. The essence of Bertoli's argument is that Judge Lechner took every occasion to express dissatisfaction with him and his counsel, and increased Bertoli's sentence at every opportunity. A number of Bertoli's objections involve the judge's legal rulings and factual findings.[28] As noted above, such decisions rarely form the basis for recusal, especially since such decisions properly can be reviewed upon appeal. It is true that Judge Lechner sentenced Bertoli severely. But Bertoli was accused and convicted of serious crimes. The judge's "knowledge and the opinion it produced were properly and necessarily acquired in the course of the proceedings, and are indeed sometimes . . . necessary to completion of the judge's task." Liteky, ___ U.S. at ___, 114 S.Ct. at 1155. We do not believe that a reasonable person, looking at the rulings objectively, would conclude that the court was partial. Other objections involve the judge's disposition towards Bertoli.[29] However, the

_____

[28]. For instance, Bertoli points out that:

-- The judge believed Juror Six over Juror Thirteen;

-- After the verdict, the judge remanded Bertoli rather than keeping him free on bail;

-- The judge's credibility and legal determinations at sentencing generally resulted in increases in the offense level;

-- The judge adopted the government's arguments about how to group the offenses for sentencing purposes.


[29]. For instance:

-- The judge criticized Mr. Bertoli in front of the jury;

judge's comments, while perhaps reflecting impatience and frustration, appear to have been directed solely at the manner in which Bertoli tried his case. In fact, "[i]f the judge did not form judgments of the actors in those court-house dramas called trials, he could never render decisions." Id. at ___, 114 S.Ct. at 1155 (quoting In re J.P. Linahan, Inc., 138 F.2d 650, 654 (2d Cir. 1943)); see also Liteky, ___ U.S. at ___, 114 S.Ct. at 1157 ("A judge's ordinary efforts at courtroom administration -- even a stern and short-tempered judge's ordinary efforts at courtroom administration -- remain immune.").

Thus, this case is distinguishable from other occasions where we have required recusal. In Primerica Holdings, Inc., the record reflected that the district judge accused the petitioners

(..continued)
-- In denying Bertoli's motion for a mistrial, the judge described the motion as "ridiculous, absurd and baseless." He further said

> You have been conducting yourself throughout this trial trying to create error, trying to create a record. This is another example of it. This is an absurd motion, it's just another in the line of your baseless motions. That's denied. Now please sit down. Mr. Bertoli, your smirks, your laughing, your rolling your eyes, your sneering can't be tolerated any more. If you do it again in front of the jury, I'll have to comment in front of the jury. You're out of bounds and unprofessional. You're not conducting yourself the way you should. You're not acting like an attorney. Your cross-examination was anything but an attorney's cross-examination. Now, please stop it and please sit down and remain there. App. at 670-71.

-- The judge told Bertoli that "[f]rom day one in this case either you or your attorneys have been taunting me."

themselves of acting in bad faith, and by responding in detail to a petition for a writ of mandamus, had taken a personal interest in the case. In Haines v. Liggett Group Inc., 975 F.2d 81, 98 (3d Cir. 1992), statements in a pre-trial opinion by the judge appeared to pre-judge important and disputed issues in the case; see also In re Asbestos Litig., 977 F.2d at 778-85 (judge's attendance at conference at plaintiff's expense constituted appearance of partiality).

We are all the more wary of reassigning this case, because the record reflects that Bertoli engaged in a concerted campaign to have Judge Lechner removed from the case. On November 2, 1987, Bertoli wrote a letter to Judge Lechner criticizing the judge's handling of Cannistraro's sentencing in an earlier case. He threatened that "[i]f you do not resign from the bench within thirty days, I will refer this matter to the Judiciary committee and bar association for action." App. at 346. The next day, Bertoli wrote to then-Justice Thurgood Marshall of the United States Supreme Court purporting to make a "formal complaint and request to reprimand and take such other action including impeachment. . . ." App. at 346-47 (quoting letter). Then, Bertoli boasted to others that he was trying to antagonize the judge. See app. at 354-55. Moreover, these actions occurred at a time when "it appear[ed] Bertoli was aware that he was a subject of a grand jury investigation which also concerned Eisenberg." Eisenberg, 734 F. Supp. at 1145. We always should be "keenly aware of the impact [decisions mandating recusal] might have on the conduct of all disputed matters and

cases that district court judges try." Primerica Holdings, Inc., 10 F.3d at 166. This principle is especially important in this case, lest we encourage tactics designed to force recusal.

Nor will we exercise our supervisory powers to reassign the case upon remand. Although in Liteky, the Supreme Court declined to address whether the "extrajudicial source" doctrine applies to a Court of Appeals' supervisory powers to reassign a case upon remand, we previously have reviewed such requests under an "appearance of impartiality" standard. Primerica Holdings, Inc., 10 F.3d at 167; Blasband v. Rales, 979 F.2d 324, 328 (3d Cir. 1992); Haines, 975 F.2d at 98. We need not address the extent to which the standards set forth in Liteky apply to this supervisory power, because we simply do not believe the district court has exhibited an appearance of partiality.

### III.  CONCLUSION

For all the reasons detailed above, we will affirm the judgment of conviction on March 30, 1994. However, we will vacate the sentence and will remand to the district court for resentencing in accordance with this opinion.

USA v. Bertoli
No. 94-5167


ROTH, Circuit Judge, concurring:


I join the opinion in Parts I, II.A.1, and 2, II.B, and III. I concur with the result that the majority reaches in Part II.A.3. I write separately, however, to express my concern on the issue of providing written transcripts to the jury. I recognize that other circuits have afforded trial courts great discretion in determining whether or not to allow copies of written transcripts to go to the jury. In view of this precedent, I agree that the trial court in this case did not abuse its discretion.

I approve the cautionary language that the majority suggests to prevent the jury from focusing improperly on one portion of the testimony contained in a transcript. However, I would prefer to go further. I would exercise our court's inherent supervisory power to bar trial courts from permitting the jury to obtain copies of written transcripts of trial testimony unless the district judge ensured that: (1) no party was likely to be unduly prejudiced, and (2) the transcript or particular portion thereof was not likely to be improperly used by the jury.[30] In this regard, the trial court should afford
_____
[30]. Although it is not to be invoked lightly, we have exercised our supervisory power to resolve various procedural and

counsel for each party the opportunity to express counsel's

opinion as to the likelihood of prejudice and improper use.

The Uniform Rules of Criminal Procedure (1987)

provide support for the limitation that I would propose to place

on a trial court's discretion to send written transcripts to the

jury.  In particular, Rule 533 provides that:

> "If the jury, after retiring for
> deliberations, requests a review of any
> evidence, the court, after notice to the
> parties, shall recall the jury to the
> courtroom.  If the jury's request is
> reasonable, the court shall have any
> requested portion of the testimony read or
> played back to the jury and permit the jury
> to reexamine any requested exhibit received
> in evidence.  The court need not submit
> evidence to the jury for review beyond that
> specifically requested by the jury, but the
> court also may have the jury review other
> evidence relating to the same factual issue
> in order to avoid undue emphasis on the
> evidence requested.  If it is likely that the
> jury cannot otherwise adequately consider any
> evidence reviewed, the court may permit the
> jury to take the evidence, including any part
> of a deposition or of a prepared transcript
> or recording of the testimony, to the jury
> room if it appears:

(..continued)
substantive matters and to provide guidance to the district
courts.  See, e.g., Pansy v. Borough of Stroudsburg, 23 F.3d 772,
786 and n.16 (3d Cir. 1994) (invoking inherent supervisory power
to require a showing of good cause whenever order of
confidentiality is granted); Sowell v. Butcher & Singer, Inc.,
926 F.2d 289, 295 (3d Cir. 1991) (invoked supervisory power to
require district courts, when granting motion for directed
verdict, to set forth explanation sufficient to permit this Court
to understand legal premise upon which decision was based); see
also Murray M. Schwartz, The Exercise of Supervisory Power By the
Third Circuit Court of Appeals, 27 Vill. L. Rev. 506, 510-11
(1982).

> (1) no party will be unduly prejudiced; and
>
> (2) the evidence is not likely to be improperly used by the jury.

(emphasis added).[31]

I believe that the exercise of our supervisory power in this manner would best protect the parties from the the problems which are inherent in permitting trial transcripts to go to the jury room.  At the same time we would afford a district court the discretion to provide the jury with transcripts when

_____

[31]. It is worthy of note, however, that the American Bar Association's related Standard 15-4.2 of its Standards for Criminal Justice (1991) does not make any reference to the practice of permitting transcripts of testimony to go into the jury room:

> Jury request to review evidence.
> (a)  If the jury, after retiring for deliberation, requests a review of certain testimony or other evidence, they shall be conducted to the courtroom.  Whenever the jury's request is reasonable, the court, after notice to the prosecutor and counsel for the defense, shall have the requested parts of the testimony read to the jury and shall permit the jury to reexamine the requested materials admitted into evidence.
> (b)  The court need not submit evidence to the jury for review beyond that specifically requested by the jury, but in its discretion the court may also have the jury review other evidence relating to the same factual issue so as not to give undue prominence to the evidence requested.

(emphasis added).  I read the failure of this standard to discuss the practice of sending transcripts to the jury as a reluctance on the part of the ABA to encourage courts to engage in such a practice on a regular basis.

the court determines that such a practice is necessary and not likely to be prejudicial to the parties.  Although such a rule might indeed constitute an "intrusion into the district court's discretion to adapt procedures to the situation in the case before it," see Majority Opinion at 35, because of the magnitude of my concerns, I consider such an intrusion to be warranted.